**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-1920

WILDEARTH GUARDIANS,
HIGH COUNTRY CONSERVATION ADVOCATES,
CENTER FOR BIOLOGICAL DIVERSITY,
SIERRA CLUB, and
WILDERNESS WORKSHOP,

      Petitioners,

v.

DAVID L. BERNHARDT, in his official capacity as United States Secretary of the Interior;
UNITED STATES OFFICE OF SURFACE MINING RECLAMATION AND
ENFORCEMENT;
JOSEPH BALASH, in his official capacity as Assistant Secretary of Land and Minerals
Management, U.S. Department of the Interior,
GLENDA OWENS, in her official capacity as Acting Director of U.S. Office of Surface Mining
Reclamation and Enforcement;
DAVID BERRY, in his official capacity as Regional Director of U.S. Office of Surface Mining,
Western Region;

      Federal Respondents.

---

**PETITION FOR REVIEW OF AGENCY ACTION**

---

## INTRODUCTION

1.      For the past thirty-seven years, the beautiful, forested mountains of Western

Colorado have been under siege as the West Elk Coal Mine has metastasized across the

landscape. Through a series of more than a dozen modifications to its federal coal leases and

mining plans, West Elk has continually grown and now sprawls over nearly 20,000 acres of

lands, including more than 13,000 acres of National Forest lands. In 2017, BLM and the Forest

Service authorized the most recent 1,720 acre expansion of West Elk into the previously undisturbed Sunset Roadless Area.

2.      This action challenges Federal Defendants' recent approval of the "Mining Plan" authorizing the development of publicly owned coal across this new expansion. The Mineral Leasing Act of 1920, as amended ("MLA"), 30 U.S.C. § 181 *et seq.*, and the Surface Mining Reclamation and Control Act ("SMCRA") of 1977, 30 U.S.C. § 1201 *et seq.*, require the Secretary of the Interior to approve mining plans before publicly-owned coal can be mined. Among other things, a mining plan must ensure that mining complies with applicable federal laws and regulations and be based on information prepared in compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4231 et seq. See 30 C.F.R. § 746 et seq.

3.      Federal Defendants' approval of the Mining Plan challenged here authorizes expansion of the West Elk Mine onto an additional 1,720 acres of federal coal and facilitating development on 1,100 acres of adjacent private land. Through the Mining Plan, some 10.1 million tons of federal coal and 7.5 million tons of private coal have been opened up for extraction, extending the life of the West Elk mine by several years. The Mining Plan also authorizes development of 43 methane drainage wells and about 8.4 miles of new roads needed for construction and access to the drainage wells.

4.      The Mining Plan for the West Elk expansion must be set aside because it violates NEPA.

5.      First, Federal Defendants violated NEPA by failing to consider a reasonable alternative that would have reduced or offset methane pollution associated with coal mining at the expanded West Elk Mine. At the lease modification stage, the Forest Service and Bureau of

Land Management (BLM) kicked the can down the road on this analysis, deeming it premature and explaining that flaring was not considered in detail "because it, like all other methane mitigation measures, requires detailed engineering and economic considerations that would occur later in the process." Accordingly, the prior decision to authorize the lease modifications relied upon an assumption that analysis of methane mitigation, including flaring, would occur once the Mining Plan was available. But now, at the Mining Plan stage, Federal Defendants still have failed to analyze a methane mitigation alternative, which violates NEPA.

6.      Second, Federal Defendants violated NEPA by failing to support (a) their determination that the Supplemental Environmental Impact Statement from the leasing modifications stage ("Leasing SFEIS") was "adequate" to cover the activities permitted by the Mining Plan, and (b) their adoption of the Supplemental EIS without any further NEPA analysis.

7.      Third, Federal Defendants violated NEPA by failing to take a hard look at the cumulative impacts of climate change. Relying solely on the Leasing SFEIS for their assessment of climate impacts of the Mining Plan, Federal Defendants failed to consider newly permitted and proposed coal mining and oil and gas development activities that have cumulative impacts on climate in conjunction with the West Elk expansion. Federal Defendants also ignored important new information now available regarding the total cumulative greenhouse gas emissions from fossil fuel development on federal lands, as well as new climate science that further develops and affirms scientific understanding of the impacts and risks of climate change.

8.      Fourth, Federal Defendants violated NEPA by failing to take a hard look at impacts to water resources and fish. Federal Defendants downplayed new information identifying previously-unknown perennial springs and streams within the mine expansion area,

and failed to meaningfully assess the risk that such critical water resources could be dewatered

by mining activities, and the resulting ecological and other impacts if that were to occur.

9.      Accordingly, Conservation Groups allege that Federal Defendants violated NEPA

and the Administrative Procedure Act ("APA"), 5 U.S.C. §701 *et seq.*, by unlawfully approving

the Mining Plan for the West Elk Mine in Colorado.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal

question), 1346 (United States as a defendant), 2201 (declaratory relief), and 2202 (injunctive

relief). Conservation Groups' claims arise under the judicial review provision of the APA, 5

U.S.C. §§ 701-706. This Court has jurisdiction to grant Conservation Groups their attorneys'

fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

11.     An actual and present controversy exists between the parties within the meaning

of the Declaratory Judgment Act, 28 U.S.C. § 2201.

12.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(2) because "a

substantial part of the events or omissions giving rise to the claim" took place in Colorado. The

Mining Plan at issue in this case is for the West Elk Mine, located in Colorado.

## PARTIES

13.     Petitioner WILDEARTH GUARDIANS is a non-profit membership organization

based in Santa Fe, New Mexico, with offices in Denver, Colorado, and other western states.

Guardians has more than 231,000 members and supporting activists, some of whom live, work,

and/or recreate on public and private lands around and within view of the West Elk Mine that is

the subject of this Petition. Guardians and its members are dedicated to protecting and restoring

the wildlife, wild places, wild rivers, and health of the American West. Towards this end, Guardians and its members work to replace fossil fuels with clean, renewable energy in order to safeguard public health, the environment, and the Earth's climate.

14.     Petitioner HIGH COUNTRY CONSERVATION ADVOCATES is a non-profit conservation organization headquartered in Crested Butte, Colorado. Founded in 1977 as High Country Citizens' Alliance to keep Mount Emmons molybdenum mine-free, the group's work now addresses other issues that affect Gunnison County's clean air, clean water, public lands, and healthy wildlife. HCCA has about 900 members who live, recreate, and enjoy the rural and wild character of Gunnison County and its public lands. HCCA is an active participant in public lands management in Gunnison County, including the lands at issue in this case.

15.     Petitioner THE CENTER FOR BIOLOGICAL DIVERSITY is a non-profit environmental organization with over 69,500 members, many of whom live and recreate in western Colorado. The Center is headquartered in Tucson, Arizona, with offices in a number of states and Mexico. The Center uses science, policy, and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive. The Center has and continues to actively advocate for increased protections for species and their habitats in Colorado.

16.     Petitioner WILDERNESS WORKSHOP is a non-profit organization engaged in research, education, legal advocacy and grassroots organizing to protect the ecological integrity of local public lands. Wilderness Workshop is based in Carbondale, Colorado and has approximately 800 members. Wilderness Workshop not only defends pristine public lands from new threats, but also strives to restore the functional wildness of landscapes fragmented by

human activity. Wilderness Workshop works to protect and preserve existing wilderness areas, advocate for expanding wilderness, defend roadless areas from development that would destroy their wilderness character, and safeguard the ecological integrity of all federal public lands in the vicinity of the White River National Forest, including the lands at issue in this case.

17.     Petitioner SIERRA CLUB is America's largest grassroots environmental organization, with more than 830,000 members nationwide, including more than 24,000 members in Colorado. The Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.

18.     Petitioners WildEarth Guardians, High Country Conservation Advocates, The Center for Biological Diversity, Wilderness Workshop, and the Sierra Club (collectively, "Conservation Groups") and/or their members have commented and been involved in every stage of Federal Defendants' decision-making process.

19.     Members and staff of the Conservation Groups live, work, recreate, and conduct other activities on public and private lands on, around, and within view of lands affected by the approval of the West Elk Mining Plan and the coal mining and related activities that the Mining Plan authorizes. Conservation Groups and their members regularly use lands affected by approval of the Mining Plan for a variety of purposes, including wildlife and wildflower viewing, photography, hiking, recreation, and aesthetic appreciation of the area's natural, wild values. Conservation Groups' members plan to return to the lands affected by approval of the Mining Plan and expansion of the West Elk Mine this year and every year for the foreseeable future.

Conservation Groups' and their members' recreational, aesthetic, and health interests will be irreparably harmed by bulldozing for road and pad clearing, as well as emissions of volatile organic compounds and other air pollutants emitted during construction and operation of the proposed project. Road and well pad construction will destroy wildlife habitat and vegetation, and degrade Conservation Groups' members' enjoyment of wildlife, photography, recreation, and the natural and wild character of the Sunset Roadless Area. That harm is a direct result of the inadequate agency analyses challenged here which, together, authorize construction within roadless national forest and prolong the mine's life by more than two years. A favorable decision will set aside agency decisions authorizing such damaging actions until the agencies appropriately evaluate environmental impacts.

20.     Conservation Groups and their members also have substantial interests in intact ecosystems free from permanent contamination and dewatering of perennial springs and riverine habitats that destroy fish populations and other aquatic wildlife. These interests will be irreparably harmed by expansion of the West Elk mine authorized by the Mining Plan, which may lead to permanent dewatering of springs and streams throughout the mine expansion area.

21.     Conservation Groups and their members also have a substantial interest in ensuring that Federal Defendants comply with federal law, including the requirements of NEPA. Federal Defendants' failure to comply with NEPA harms Conservation Groups' members and staff by denying them the right to informed decision-making and full disclosure under NEPA, as well as the right to meaningfully participate in the decision-making process. Conservation Groups' and their members' interests have been, are being, and will continue to be irreparably harmed by Federal Defendants' approval of the West Elk Mining Plan challenged herein that will

further degrade the lands, water resources, air quality, and overall health of the environment in Colorado.

22. Defendant DAVID BERNHARDT is sued in his official capacity as U.S. Secretary of the Interior. In this capacity he is responsible for approving, disapproving, or conditionally approving Mining Plans and Mining Plan modifications pursuant to the MLA, 30 U.S.C. § 207(c) and SMCRA, 30 U.S.C. § 1273(c).

23. Defendant OFFICE OF SURFACE MINING, RECLAMATION AND ENFORCEMENT ("OSM") is a federal agency within the United States Department of the Interior. OSM is responsible for making recommendations to the Secretary of the Interior as to whether or not, or under what conditions, he should approve Mining Plans or Mining Plan modifications. OSM is also responsible for ensuring agency compliance with NEPA and other federal laws that apply to approval of mining plans and mining plan modifications. OSM's Western Regional Office, which is located in Denver, recommended the Secretary approve the Mining Plan challenged herein.

24. Defendant DAVID BERRY is sued in his official capacity as Regional Director of OSM's Western Region. Mr. Berry is responsible for managing federal coal resources, including those involved in this action, and for making recommendations to the Secretary of the Interior regarding applications for mining plan modifications. Mr. Berry is also responsible for implementing and complying with NEPA and other federal laws governing review and recommendations for approval, conditional approval, or disapproval of applications for mining plan modifications. Mr. Berry signed OSM's Record of Decision adopting the Leasing Modifications Supplemental EIS for the Mining Plan modifications.

25.     Defendant GLENDA OWENS is sued in her official capacity as acting Director of OSM. Ms. Owens is responsible for assuring that OSM complies with federal laws, including NEPA and other laws governing review and recommendations for approval, conditional approval, or disapproval of applications for mining plan modifications. Ms. Owen's provided OSM's formal recommendation for approval of the West Elk Mining Plan modification to the Assistant Secretary of Land and Minerals Management.

26.     Defendant JOSEPH BALASH is sued in his official capacity as Assistant Secretary of Land and Minerals Management of the U.S. Department of the Interior. Mr. Balash is responsible for complying with federal laws governing approval, conditional approval, or disapproval of applications for mining plan modifications. Mr. Balash approved the Mining Plan modification, allowing expansion of the West Elk Mine into the Sunset Roadless Area.

## LEGAL BACKGROUND

### I.      The Mineral Leasing Act and Surface Mining Reclamation and Control Act

27.     Under the MLA, the Secretary of Interior has two primary responsibilities regarding the disposition of federally owned coal.

28.     First, the Secretary is authorized to lease federal coal resources, where appropriate. *See* 30 U.S.C. §§ 181 and 201. A coal lease must be in the "public interest" and include such "terms and conditions" as the Secretary of the Interior shall determine. 30 U.S.C. §§ 201 and 207(a); *see also* 43 C.F.R. §§ 3425.1-8(a) and 3475.1. A coal lease is issued "for a term of twenty years and for so long thereafter as coal is produced annually in commercial quantities[.]" 30 U.S.C. § 207(a); 43 C.F.R. § 3475.2. The U.S. Bureau of Land Management

("BLM"), an agency within the Interior Department, is largely responsible for implementing the Secretary's coal leasing responsibilities.

29.     The second responsibility of the Secretary of the Interior is to authorize, where appropriate, the mining of federally owned coal through approval of a Mining Plan. The authority to issue a Mining Plan is set forth under the MLA, which states that before any entity can take action on a leasehold that "might cause a significant disturbance of the environment," an operation and reclamation plan must be submitted to the Secretary of the Interior for approval. 30 U.S.C. § 207(c). Referred to as a "Mining Plan" by SMCRA and its implementing regulations, the Secretary "shall approve or disapprove the [mining] plan or require that it be modified." 30 U.S.C. § 1273(c); 30 C.F.R. § 746.14. It is standard practice for the Assistant Secretary of the Interior for Land and Minerals Management to sign such Mining Plans on behalf of the Secretary, as occurred here.

30.     Although under SMCRA states have largely been delegated authority to regulate coal mining activities, the law prohibits the Secretary of Interior from delegating to states the duty to approve, disapprove, or modify Mining Plans for federally owned coal. *See* 30 U.S.C. § 1273(c); *see also* 30 C.F.R. § 745.13(i). SMCRA also prohibits the Secretary from delegating to states authority to comply with NEPA and other federal laws and regulations (other than SMCRA) with regard to the regulation of federally owned coal resources. 30 C.F.R. § 745.13(b).

31.     Among other things, a Mining Plan must, at a minimum, assure compliance with applicable requirements of federal laws, regulations, and executive orders, and be based on information prepared in compliance with NEPA. *See* 30 C.F.R. § 746.13. A legally compliant Mining Plan is a prerequisite to an entity's ability to mine leased federal coal. Regulations

implementing SMCRA explicitly state that, "[n]o person shall conduct surface coal mining and reclamation operations on lands containing leased Federal coal until the Secretary has approved the mining plan." 30 C.F.R. § 746.11(a). To this end, a Mining Plan is "binding on any person conducting mining under the approved mining plan." 30 C.F.R. § 746.17(b).

32.     Although the Secretary of Interior is charged with approving, disapproving, or modifying a Mining Plan, OSM, an agency within the Department of Interior, is charged with "prepar[ing] and submit[ting] to the Secretary a decision document recommending approval, disapproval or conditional approval of the mining plan[,]" 30 C.F.R. § 746.13. Thus, OSM and its officers play a critical role in adequately informing the Secretary of Interior.

## II.     The National Environmental Policy Act

33.     NEPA aims to "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. As Council on Environmental Quality ("CEQ") regulations implementing NEPA explain, the law "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).

34.     Under NEPA, a federal agency must prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C)(i); 40 C.F.R. § 1501.4. In the EIS, the agency must, among other things, rigorously explore and objectively evaluate all reasonable alternatives, analyze and assess all direct, indirect, and cumulative environmental effects, and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.14 and 1502.16.

35.     Direct effects include those that "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). Indirect effects include effects that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "Effects" are synonymous with "impacts." 40 C.F.R. § 1508.8.

36.     An agency may also prepare an Environmental Assessment ("EA") to determine whether an EIS is necessary. 40 C.F.R. §§ 1501.3, 1508.9. An EA must include a discussion of alternatives and the environmental impacts of the action. 40 C.F.R. § 1508.9.

37.     Where a decision is issued based on an EIS, the federal agency must prepare a "public record of decision" ("ROD"). 40 C.F.R. § 1505.2. A ROD must "state what the decision was," "[i]dentify all alternatives considered," and "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." 40 C.F.R. §§ 1505.2(a)-(c).

38.     An agency may adopt all or a portion of an EIS "provided that the statement or portion thereof meets the standards for an adequate statement" under the NEPA regulations. 40 C.F.R. § 1506.3(a).

39.     Interior's NEPA regulations also explain that adoption of pre-existing EISs and EAs is allowed. 43 C.F.R. § 46.120. However, the NEPA regulations make clear that where an EIS or EA is adopted, the agency must determine "with appropriate supporting documentation,

that it adequately assesses the environmental effects of the proposed action and reasonable alternatives." 43 C.F.R. § 46.120(c). Such supporting documentation "must include an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." *Id.*

40.     Federal agencies must "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a). To the fullest extent possible, agencies must "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment." 40 C.F.R. § 1500.2(d). At a minimum, agencies must "[p]rovide public notice of . . . the availability of environmental documents so as to inform those persons and agencies who may be interested or affected." 40 C.F.R. § 1506.6(b). "Environmental documents" include EAs, EISs, FONSIs, and notices of intent to prepare and/or consider EISs. 40 C.F.R. § 1508.10. The NEPA regulations stress that "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken" and that "public scrutiny [is] essential to implementing NEPA." 40 C.F.R. § 1500.1(b).

## III.     The Administrative Procedure Act

41.     The APA provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." *Id.*

42.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

**FACTUAL BACKGROUND**

43.     The Sunset Roadless Area is a 5,800 acre forested landscape which hugs the west

flank of 12,700-foot Mount Gunnison and the West Elk Wilderness in northwestern Gunnison

County, Colorado. Undisturbed until coal exploration activities began in late 2018, the area is

characterized by wide swaths of aspen groves and mixed conifer forest. Wildflowers, meadows,

natural springs, headwater streams, and beaver ponds are also found here. These habitats support

numerous different wildlife species, from black bear and the imperiled Canada lynx to chorus

frogs and snakes. The area is treasured by hunters and hikers alike for its remoteness and beauty.

Visitors may delight in stunning views of Mount Lamborn and the Ragged Mountains while

enjoying a quiet hike in the pristine forest.

44.     For years, this intact forest has been on the chopping block, threatened by a

proposed expansion of the West Elk Mine, owned by a subsidiary of the nation's second largest

coal company, Arch Coal. Since 2009, Arch has been seeking to expand the mine's underground

operations beneath the Sunset Roadless Area. Operating the below-ground mine, however,

requires substantial above-ground construction within the roadless area. Expanding West Elk

mine will result in a spiderweb network of bulldozed roads, the flattening and clearcutting of

forest for drilling pads, and methane drainage wells that will directly release methane, a powerful

greenhouse gas, to the atmosphere.

45.     With Interior's recent approval of a Mining Plan modification for the West Elk

Mine (Federal Coal Leases COC-162, COC-67232), Arch is now poised to expand its coal

mining operations into the Sunset Roadless Area, building miles of roads and dozens of drainage

well pads across this relatively-undisturbed landscape at significant environmental cost. While

14

exploration activities since issuance of the lease for the mine expansion area have partially

degraded the natural character of some of the area, these existing impacts are a small fraction of

what the Mining Plan authorizes. Expanding the West Elk Mine will require construction of

about 8.4 miles of new roadway, fragmenting important wildlife habitat. Expansion will involve

installation of 43 methane drainage wells, mostly within the Sunset Roadless Area, releasing

pollutants with significant impacts on local and regional air quality and the global climate. And

mining activities will lead to substantial land subsidence over a large area and potentially

dewatering perennial headwater springs, critical resources in this semi-arid region.

I.    **Administrative Procedural History of the West Elk Mine Expansion**

A.  **The First, Failed Attempt to Open Up the Sunset Roadless Area to Coal Mining**

46.    This is not the first time that this important landscape has been threatened. In

2012 and 2013, the Forest Service and Bureau of Land Management (BLM) issued a suite of

decisions approving an expansion that would have led to the construction of more than 6 miles of

roads and nearly 50 drilling pads within a 1,700-acre area at the heart of the Sunset Roadless

Area, similar to the mine expansion area approved under the challenged Mining Plan. First, in

2012, the Forest Service adopted the Colorado Roadless Rule, which included a North Fork Coal

Mining Area "exception," which allowed temporary road construction for coal mining in the

Sunset Roadless Area and certain other roadless lands. 77 Fed. Reg. 39,576, 39,576 (July 3,

2012). Second, the Forest Service officially consented to the Lease Modifications in late 2012,

paving the way for BLM to approve lease modifications on March 27, 2013. Third, BLM

approved a coal exploration plan in late June 2013, with the purpose of allowing about six miles

of road and 10 drilling pads to be constructed within the Sunset Roadless Area.

47.     This Court, however, stopped this threatened destruction in 2014 by vacating the federal agencies' decisions, which had been challenged by several of the current Petitioners, citizen conservation groups High Country Conservation Advocates, WildEarth Guardians, and Sierra Club. The Court held that the Forest Service and BLM violated the National Environmental Policy Act (NEPA) in their environmental review by turning a blind eye to the project's huge climate costs while carefully accounting for the alleged economic benefits of the expansion, an approach that subverted the law's mandate that agencies take a "hard look" at environmental impacts. *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174 (D. Colo. 2014).

**B.  Renewed Efforts to Expand the West Elk Mine into the Sunset Roadless Area**

48.     The threat to the Sunset Roadless Area did not end there, however, as Arch continued its efforts to expand the mine. In 2015, the Forest Service announced its intent to consider re-imposing the coal mine exception to the Colorado Roadless Rule and to prepare supplemental environmental analysis discussing the impacts of that proposal. 80 Fed. Reg. 18,598 (Apr. 7, 2015). But despite having a second opportunity to fully account for the mine expansions' harms, the agencies once again underestimated or obscured the climate pollution impacts of the expansion while improperly boosting the purported economic benefits. After conducting new, still-flawed NEPA analysis, the Forest Service and BLM made a series of decisions that set the stage for Arch to move forward with the expansion.

49.     First, effective April 17, 2017, the Forest Service reinstated an exception to the Colorado Roadless Rule, which otherwise generally prohibits road construction in Forest Service roadless areas. 81 Fed. Reg. 91811 (Dec. 19, 2016); 82 Fed. Reg. 9973 (Feb. 9, 2017). This

loophole allows road construction for coal mining within the 19,700-acre "North Fork Coal Mining Area," which encompasses the Sunset Roadless Area as well as nearby Pilot Knob and Flatirons Roadless Areas.

50.     Second, on September 7, 2017, the Forest Service (with BLM as a cooperator) issued its Leasing SFEIS and a draft Record of Decision (ROD) to approve modification of two coal leases at West Elk.

51.     Third, on December 11, 2017, the Forest Service consented to the modification of two coal leases, paving the way for the mine to expand into 1,700 acres of the Sunset Roadless Area, and access approximately 17.6 million tons of coal.

52.     Fourth, on December 15, 2017, Katharine MacGregor, the Department of the Interior Deputy Assistant Secretary for Land and Minerals Management issued a Record of Decision approving the lease modifications for West Elk, covering 1,720 acres of federal lands and adding approximately 10.1 million tons of federal coal to the West Elk Mine.

53.     On the same day, December 15, 2017, citizen conservation groups brought a new legal challenge to these Forest Service and BLM actions, which opened up the Sunset Roadless Area to road-building for expanded coal mining at West Elk. Among other claims, conservation groups alleged that the Leasing SFEIS failed to cure the agency's prior failures to take a hard look at climate pollution impacts and wildlife fragmentation. Conservation groups also challenged the agencies' failure to consider a reasonable methane mitigation alternative which would have reduced or offset methane pollution associated with the lease modifications, despite evidence in the record showing that methane flaring would be practical and cost-effective at West Elk.

54.     This court dismissed the NEPA litigation challenging the 2017 decisions, *High Country Conservation Advocates v. U.S. Forest Serv.*, 333 F. Supp. 3d 1107 (D. Colo. 2018). The district court's decision is currently on appeal. *High Country Conservation Advocates v. U.S. Forest Serv.,* No. 18-1374 (10th Circuit Appeal Filed Sept. 11, 2018).

### C.  Approval of the Mining Plan Modification

55.     Following the issuance of the lease, Arch submitted a Permit Application Package for the West Elk Mine expansion to the state permitting agency, the Colorado Division of Reclamation, Mining, and Safety. The state agency's approval of Permit Revision No. 15 became effective on November 15, 2018.

56.     On March 12, 2019, Defendant David Berry, OSM's Western Regional Director, issued a memorandum recommending approval of the proposed Mining Plan modifications for West Elk Mine and signed a Record of Decision adopting the Leasing SFEIS and formally recommending approval of the Mining Plan.

57.     On March 15, 2019, OSM issued a Federal Register Notice announcing its intent to adopt the Leasing SFEIS for the Mining Plan modification. 84 Fed. Reg. 9554 (Mar. 15, 2019).

58.     On or about March 15, 2019, OSM staff completed a NEPA Adequacy Review Form, or Determination of NEPA Adequacy ("DNA"), which found the Mining Plan action to be "substantially similar" to the Leasing Modifications analyzed in the Leasing SFEIS and concluded that "the environmental analysis completed in the [Leasing Modifications] SFEIS is adequate."

59.     This DNA contained no new environmental analysis or consideration of updated climate science or hydrologic information. Instead, the DNA simply listed the NEPA adequacy criteria, and cursorily concluded that each of the criteria were met. Federal Defendants failed to document any independent assessment of the Leasing SFEIS and its applicability to the Mining Plan approvals.

60.     On or about March 15, 2019, Defendant Glenda Owens, OSM's Acting Director, issued a memorandum to the Assistant Secretary Land and Minerals Management recommending approval of the West Elk expansion Mining Plan.

61.     On April 19, 2019, Assistant Secretary Land and Minerals Management, Department of Interior, Joseph Balash, signed the formal Mining Plan Approval for the modification of Federal leases COC-1362 and COC-67232 for the West Elk Mine, the final step before Arch can begin on-the-ground construction activities on the 1,720 acres of land opened up for coal mining by the 2017 lease modifications.

62.     OSM's standard practice before formally recommending approval of a mining plan is to issue a NEPA scoping notice for the proposed approval and solicit comments from the public regarding the proper scope of the NEPA analysis. OSM then publicly releases a draft EA and solicits public comment regarding the draft EA. OSM routinely issues Records of Decision or FONSIs and recommendations for Secretarial approval of mining plans only after providing multiple opportunities for public involvement in the NEPA process does. Conservation Groups fully expected OSM to follow this standard practice.

63.     OSM's NEPA Handbook provides that unless an activity is categorically excluded from NEPA review – which approval of mining plans is not – then "an EA should be prepared

unless the action is listed as normally requiring an EIS or clearly would have significant impacts." Thus, OSM was supposed to – and Conservation Groups relied on the agency to – prepare either an EA or an EIS to meet its NEPA obligations before approving the West Elk Mining Plan, and to involve the public in its decision-making process.

64.     At no point prior to OSM's adoption of the Leasing SFEIS and decision to formally recommend the Mining Plan for Secretarial approval did Federal Defendants provide public notice of the agencies' ongoing review of the adequacy of existing NEPA analyses to cover approval of the Mining Plan. Federal Defendants did not solicit public comment regarding OSM's Determination of NEPA Adequacy or the agency's recommendation to the Assistant Secretary for approval of the Mining Plan. Thus, prior to the Mining Plan being approved, the general public, including Conservation Groups, were given no notice of an opportunity to provide Federal Defendants with comments or any new information regarding the impacts of the West Elk Mine expansion.

65.     Federal Defendants' approvals of the Mining Plan must be set aside because they violate NEPA, as elaborated below.

## II.     The West Elk Mine

66.     The West Elk Mine is located near Paonia, Colorado, in the North Fork Valley of Gunnison County. The Mine opened in 1982 and is an underground coal mine that employs the longwall mining method. The Mine is owned and operated by Mountain Coal Company LLC, a subsidiary of the nation's second largest coal producer, Arch Coal. The Mine largely underlies lands managed by the U.S. Forest Service as the Grand Mesa, Uncompahgre, and Gunnison National Forests. The West Elk Mine has an annual production capacity of 8.5 million tons of

coal, but based on lower production rates in recent years, Federal Defendants project future annual production at a rate of 6.5 million tons of coal per year.

67.    The geologic formations in and adjacent to the coal seams mined at West Elk contain significant amounts of methane, which is released as a result of mining. Because it is combustible, methane can pose a safety hazard in mines. To protect miners, the federal Mine Safety and Health Administration requires Arch to remove excess methane, which the Mine has chosen to do by venting methane directly into the atmosphere through methane drainage wells. These methane drainage wells are located every 750 to 1,000 feet on the land surface above the longwall panel.

68.    In addition to providing access to the 1,720 acres of land and 10.1 million tons of federal coal opened up for potential development by the 2017 lease modifications, the Mining Plan also allows Arch to access and mine additional coal on adjacent Forest Service and private lands, in accordance with permits issued by the State of Colorado. This adjacent Forest Service and private land coal likely would not be mined without approval of a Mining Plan for the West Elk expansion area because of the geometric alignment of underground coal "panels" (areas to be mined) on the existing leases. More than 1,100 new private acres have recently been added to the permit area for Colorado Permit No. C-1980-007, lands from which coal resources are only economically recoverable if the adjacent federal coal opened up by the Mining Plan is also made available. Taking into account the 7.5 million tons of coal from private lands and from existing federal leases that would otherwise not be mined, the Mining Plan effectively authorizes Arch to access an additional 17.6 million tons of coal in excess of what had previously been permitted.

### III.   The Sunset Roadless Area

69.    The Sunset Roadless Area is a 5,800-acre expanse of aspen and giant spruce

forests located nine miles east of Paonia, Colorado, and directly adjacent to the West Elk

Wilderness Area. Undeveloped and unroaded before coal exploration activities began last year,

the Sunset Roadless Area remains home to elk, mule deer, black bear, wild turkey, beaver,

chorus frog, goshawk, and mountain lion. The Sunset Roadless Area also contains habitat for the

threatened Canada lynx. Because the Sunset Roadless Area contains high-quality, undeveloped

Forest Service lands, in 2005 the Forest Service found nearly 3,000 acres of the Sunset Roadless

Area "capable" of wilderness protection.

70.    Virtually all – over 99% – of the Mine's expansion authorized by the Mining Plan

would occur in the Sunset Roadless Area. With the Mine's expansion, more than 1,700 acres of

the 5,800-acre Sunset Roadless Area will be pock-marked by 38 methane drainage wells and

associated well pads and crisscrossed by approximately 6.9 miles of roads needed to access

them. Five additional methane drainage wells and 1.5 miles of roadways will also be constructed

on adjacent private lands. Expansion of the West Elk Mine into the Sunset Roadless Area will

fragment wildlife habitat, destroy plant and wildlife communities, cause substantial land

subsidence, cause increased air and climate pollution, diminish solitude, potentially dry up

natural springs and perennial headwater streams, and significantly harm other resources in the

Roadless Area. Aspen and spruce trees a century old or older will be logged; the U.S. Fish and

Wildlife Service concluded that habitat may not recover its "functionality" for some wildlife

species for 30-40 years after the roads and well pads are decommissioned. The area's capability

for preservation as wilderness would also be compromised due to the construction of roads, well

pads, and clearcutting, some of which will occur within the lands identified as wilderness capable by the Forest Service in 2005.

### IV.   Environmental Impacts of the West Elk Mine

71.     The direct impacts of underground coal mining include air quality impacts, water quality impacts, fish and wildlife impacts, and alteration of landscapes and scenic views. Indirectly, coal mining leads to environmental impacts associated with coal transport and coal combustion. Such indirect impacts can include, but are not limited to, air pollution impacts from diesel-powered locomotives hauling coal trains, coal dust impacts on air and water quality from coal trains or other transportation methods, air and water pollution impacts from coal-fired power plants, and waste disposal (i.e., coal ash waste disposal) impacts associated with the operation of coal-fired power plants and other facilities that burn coal.

### A.  Surface Impacts of the West Elk Mine

72.     The roads and drilling pads contemplated by the Mining Plan will clearcut forest, destroy and fragment habitat, displace wildlife, alter hydrology, and transform a natural forest into a developed area. The scars of construction will persist for decades, long after the mine has removed its coal and moved on.

73.     The drilling of methane drainage wells required to mine coal at the West Elk Mine will cause damaging surface impacts to the land above and adjacent to the Mine. Each methane drainage well requires bulldozing an area up to one acre in size to clear the well pad. In addition, each methane drainage well requires the construction of roads to transport the drill rig and construction and maintenance equipment that must access the drill site.

74.     Because the terrain in the area is rough and hilly, roads and pads will likely carve areas out of hillsides where cut and fill is required to level the pad and road bed. Waste pits will be dug at each drilling site. Water used in drilling operations will be sucked from nearby streams; long hoses or pipes will snake through adjacent woods to deliver water to the pad. Where roads are constructed across streams, the streams will be channelized through a metal culvert. The pads and roads needed for methane drainage wells and exploration pads will eliminate vegetation, fragment wildlife habitat, pollute surface waters, and degrade many other resources.

75.     The Mining Plan authorizes about 73.5 acres of surface disturbance for road-building and construction of methane drainage wells on the National Forest lease modification areas and adjacent private lands. This disturbance is in addition to the 22.7 acres of disturbance projected in the Leasing SFEIS for exploration activities on Forest Service lands,. The decision record for the Mining Plan approval provides no new information or assessment of the actual disturbance that has already occurred from exploration activities on the mine expansion area.

76.     Underground coal mining, as conducted at West Elk, can also cause land subsidence as the below-ground mined-out areas collapse. This land subsidence can cause land fissures or surface cracking, slope failure, topographic changes, and other damage to the landscape.

77.     As a result of coal mining at the West Elk Mine expansion area, the Leasing SFEIS projects land subsidence of up to 8 feet on more than 1,000 acres of land. This subsidence represents a permanent change in the landscape that cannot be mitigated.

**B. The West Elk Mine's Impacts to Water Resources**

78.     The West Elk expansion area sits at the headwaters of the North Fork of the
Gunnison River. Largely feeding into Minnesota Creek, which flows into the North Fork near the
Town of Paonia, the drainage area for the mine expansion is generally located in an area of "little
surface water," Leasing SFEIS at 750, magnifying the importance of impacts to these water
resources.

79.     The Leasing SFEIS concluded that "[t]here are no known perennial springs for the
lease modification areas," and projected that impacts to non-perennial springs would be
negligible, as "no loss of water is anticipated." New hydrologic information, noted in OSM's
Determination of NEPA Adequacy but not made publicly available by OSM, turns these
conclusions on their head.

80.     Specifically, OSM has now found, based on the new hydrologic information, that
"it is likely that there *are* perennial springs" associated with South Prong Creek and Horse Creek
within the mine expansion area. (emphasis added). Similarly, the new hydrologic information
indicated that South Prong Creek and Horse Creek were in fact perennial and intermittent
streams, not ephemeral streams as posited by the Leasing SFEIS. In other words, two important
natural resources – perennial springs and streams – were initially believed to not be present in the
area covered by the Mining Plan. But new data now indicates that these valuable environmental
resources are, in fact, found in the mining expansion area.

81.     Further, while the Leasing SFEIS concluded that "no discernible loss of water
[from springs] is anticipated," OSM now posits otherwise, explaining that "[p]otentially some of
the springs and seeps in the lease modification area could see a reduction or loss of flow due to

the proposed longwall mining . . . ." So not only are there perennial springs and streams that were not previously identified, OSM has identified a risk that these previously-unassessed resources may be significantly impacted by mining activities and related subsidence.

82.    The expansion of West Elk Mine may alter both above- and below-ground hydrology, including by dewatering and rerouting streams and dewatering natural springs. In adopting the Leasing SFEIS, OSM failed to take a hard look at impacts to springs and streams resulting from the West Elk Mine expansion.

83.    The dewatering of natural springs as a result of mining-induced subsidence may also impact fish species. At least six native fish species exist in the North Fork watershed: Colorado River cutthroat trout, flannelmouth sucker, bluehead sucker, roundtail chub, mottled sculpin, and speckled dace. Reducing flows or introducing pollutants in fish-bearing streams can have negative effects on fish populations. OSM failed to consider whether there are native or other sensitive fish species in perennial streams that may be affected by the Mining Plan and turned a blind eye to potential impacts when it authorized expansion of the West Elk Mine.

84.    Based on its assumption that there were no perennial springs or streams at the mine expansion area, the Forest Service did not assess impacts to fish in the Leasing SFEIS. OSM adopted the Leasing SFEIS without reassessing this determination. Even after identifying perennial springs and streams potentially impacted by expansion of the West Elk Mine, OSM did not assess the implications of potentially dewatering these waters, including impacts on native and other fish that may be present in area waters. OSM conducted no ecological assessments of these potentially-impacted springs and streams, and never evaluated whether the springs and streams are fish-bearing or may sustain important benthic invertebrate populations. Nor did OSM

evaluate the potential for impacts on fish populations and the ecology of downstream waters, such as Minnesota Creek and the North Fork of the Gunnison.

85.    Since the Leasing SFEIS was completed, new information has shown that perennial springs and streams are present in the Mining Plan area, and Federal Defendants now know that the expansion of West Elk Mine presents a risk of drying them up. Nowhere in their decision record, however, do Federal Defendants attempt to explain why this newly identified environmental risk—that the West Elk mine expansion may cause perennial springs in the area to lose flow or completely dry up—does not represent significant new information that needs to be assessed through additional environmental review. Instead, Federal Defendants simply dismissed, without explanation, the newly-identified presence of and risks to previously-unknown perennial springs – in a "semi-arid" headwaters region with "little surface water"– as "minor edits and clarifications" to the Leasing SFEIS. To the contrary, this new understanding of potential impacts to perennial springs and streams in the mine expansion area represents critical new information regarding potentially significant impacts to critical environmental and natural resources that were previously believed to not be present at all. Accordingly, OSM has failed to take a hard look at impacts to water resources and fish.

## C.  The West Elk Mine's Impacts to Climate

### 1.  The Science of the Climate Crisis

86.    Climate change has been intensively studied and acknowledged at the global, national, and regional scales. The scientific evidence is clear and compelling – climate change is being fueled by the human-caused release of greenhouse gas emissions, in particular carbon dioxide and methane.

87.     Carbon dioxide ($CO_2$) is the leading cause of climate change and the most emitted greenhouse gas in the United States. According to a 2018 EPA report, *Inventory of U.S. Greenhouse Gas Emissions and Sinks, 1990-2016* ("2016 GHG Inventory Report"), carbon dioxide comprised 82 percent of total U.S. greenhouse gas emissions, or 5,311 million metric tons. EPA's data indicates that fossil fuel combustion accounted for 93.5 percent of $CO_2$ emissions in 2016, of which coal is a significant part.

88.     Methane is a powerful greenhouse gas and, after $CO_2$, is the second-most important greenhouse gas contributing to the climate crisis. The warming influence of greenhouse gasses are frequently measured and compared using a "global warming potential," which compares the warming influence of one ton of a specified greenhouse gas to that of one ton of carbon dioxide. EPA acknowledges that methane has a global warming potential of between 28 (gas alone) and 36 (with climate feedbacks) when measured over a 100-year period. Methane's short-term climate impacts are far higher: measured over a 20-year period, methane has a global warming potential of 84 to 87, according to EPA.

89.     Scientific understanding of the climate change impacts caused by greenhouse gas emissions has increased greatly since the Forest Service issued the Leasing SFEIS in 2017. Important new information is now available regarding carbon budgeting, regional impacts of climate change, and the cumulative role of fossil fuel production on federal lands in driving national greenhouse gas emissions and climate change that OSM needed to consider as part of a hard look at climate impacts.

90.     For example, the October 2018 IPCC *Global Warming of 1.5°C* special report identified substantial risks associated with global warming exceeding 1.5°C, as opposed to the

2°C considered in its 2014 report. For example, the IPCC concluded with "high confidence" that "[s]ea level rise will continue beyond 2100 even if global warming is limited to 1.5°C in the 21st century." Even more worrisome, the IPCC noted that "marine ice sheet instability in Antarctica and/or irreversible loss of the Greenland ice sheet" could be triggered at around 1.5°C, resulting in "multi-metre rise in sea level." With just 2 meters of sea level rise, the East and Gulf coasts will face catastrophic flooding, massive population displacement, and devastating economic impacts. Among many other coastal communities, significant portions of Miami, Boston, Charleston, South Carolina, and Norfolk, Virginia will face inundation, while the vast wetlands now protecting New Orleans, Houston, Mobile, Alabama, and other Gulf coast communities will be largely gone, exposing millions of people to heightened risks of catastrophic storm surge.[1] This risk of such extreme sea level rise was not well understood even just a few years ago.

91.     The 2018 IPCC report also provides significant new information regarding carbon budgeting needed to limit global warming to 1.5°C, as needed to avoid such catastrophic effects of climate change. Federal Defendants failed to consider this new information. A "carbon budget" offers a cap on the remaining stock of greenhouse gases that can be emitted while still keeping global average temperature rise below scientifically-based warming thresholds beyond which climate change impacts are highly likely to result in severe and irreparable harm to the biosphere and humanity. In comparison to assessing only incremental emissions, carbon budgeting gets closer to the question of climate impacts, since it is linked directly to increasing temperatures and related impacts. The IPCC's new carbon budgeting information provides a

---

[1] See National Oceanic and Atmospheric Administration, Sea Level Rise Viewer, https://coast.noaa.gov/digitalcoast/tools/slr.html (last accessed June 30, 2019).

necessary tool – ignored by Federal Defendants – for fully assessing the significance of the greenhouse gas emissions from the West Elk Mine expansion.

92.     The 2018 IPCC report provided a revised carbon budget for a 66 percent probability of limiting warming to 1.5°C, estimated at 420 billion and 570 billion tons of $CO_2$ depending on the temperature dataset used, of total *all-time* global emissions from January 2018 onwards. The IPCC further explained the global emissions rate has increased to 42 GtCO2 per year, up from an average annual global emissions rate of 36 GtCO2 from 2012-2014. At this rate, the global carbon budget would be expended in just 10 to 14 years, underscoring the urgent need for transformative global action to transition from fossil fuel use to clean energy.

93.     The federal government has also developed significant new information regarding the impacts of climate change that Federal Defendants should have considered before approving the Mining Plan. In November 2017, the U.S. Global Change Research Program released Volume I of its Fourth National Climate Assessment ("*Volume I*"). Interior staff were heavily involved in preparation of the Fourth National Climate Assessment, sitting on the Federal Steering Committee and Subcommittee on Global Change Research, and included among the report's authors. The report "is designed to be an authoritative assessment of the science of climate change, with a focus on the United States, to serve as the foundation for efforts to assess climate-related risks and inform decision-making about responses," and its findings are unequivocal: man-made greenhouse gas emissions "are the dominant cause of the observed warming." Simply stated, "there is no convincing alternative explanation."

94.     *Volume I* further indicates that decisions made today will determine whether climate impacts are catastrophic or merely incredibly costly. The report states that "[c]hoices

made today will determine the magnitude of climate change risks beyond the next few decades"
and that "[w]ithout major reductions in emissions, the increase in annual average global
temperature relative to preindustrial times could reach 9° F (5° C) or more by the end of this
century."

95.     In 2018, the U.S. Global Change Research Program then released Volume II of its
Fourth National Climate Assessment: Impacts, Risks, and Adaptation in the United States
("*Volume II*"). Of note, *Volume II* provides a much more granular look at projected regional
climate impacts than any of the information the Forest Service considered in the Leasing SFEIS.
The report documents specific and concerning impacts to Colorado's environment, natural
resources, and economy that Federal Defendants need to incorporate into an updated assessment
of climate impacts.

96.     For example, the Leasing SFEIS briefly mentions that there may be undefined
changes in "the relationships between forests, surface and groundwater, wildfire, and insect
pests," but does not explain the significant risk that climate change will lead to much larger and
more frequent wildfires in Colorado. In contrast, *Volume II* describes analyses showing that this
effect is already being seen: "In the western United States, *particularly in Colorado* and
California, wildfires have become more frequent and larger in area . . . , and this trend is
expected to continue as the climate warms." (emphasis added). Overall, *Volume II* estimated that
"the area burned by wildfire across the western United States from 1984 to 2015 was twice what
would have burned had climate change not occurred." *Volume II* further explains that "[r]educing
greenhouse gas emissions can reduce ecological vulnerabilities to wildfire."

97.     *Volume II* also noted that:

Since the last assessment, published field research has provided even stronger detection of hydrological drought, tree death, wildfire increases, sea level rise, and warming, oxygen loss, and acidification of the ocean that have been statistically different from natural variation, with much of the attribution pointing to human-caused climate change. In addition, new research has provided published information on future vulnerabilities and risks from climate change, including floods, food insecurity, effects on the natural and cultural resources that sustain Indigenous peoples, illnesses due to the combination of heat with air pollution, harm to mental health, post-wildfire effects on ecosystems and infrastructure, and reductions of hydropower and fossil fuel electricity generation.

These effects were not fully examined in the Leasing SFEIS.

98.     In 2018, the U.S. Geological Survey – an agency within the Department of the Interior – also released its first ever inventory of greenhouse gas emissions associated with federal coal and oil and gas production. The report revealed that federal fossil fuel production contributes to 23% of all U.S. carbon dioxide emissions and to nearly 25% of all U.S. greenhouse gas. Federal lands in Colorado, in particular, contributed about 4% of total U.S. $CO_2$ emissions, higher than all but three other states. Colorado's methane contribution is even more significant, with federal lands in the state emitting an estimated 13% of total U.S. methane emissions. In 2014, total greenhouse gas emissions from federal lands in Colorado totaled more than 55 million metric tons of CO2e.

99.     The Leasing SFEIS, on which Federal Defendants relied to support their approvals of the Mining Plan, was finalized before the USGS report was released. Thus, by adopting the Leasing SFEIS without conducting any additional NEPA analysis, Federal Defendants completely failed to take into account this new information regarding the importance of fossil fuel production on federal lands to the national carbon budget. Further, the Leasing SFEIS did not even consider the significant cumulative emissions of $CO_2$ and methane from fossil fuel production on federal lands in Colorado alone. The USGS report provides significant

new information that Federal Defendants should have considered in evaluating the environmental impacts of their approval of the Mining Plan and West Elk mine expansion.

### 2.  Direct Climate Impacts

100.    In addition to requiring methane drainage wells and roads that scar the surface above and adjacent to the West Elk Mine, the Mine's high concentrations of methane cause and contribute to air pollution and climate change when vented into the atmosphere. The Mine emits methane through its ventilation system, and in much higher concentrations from the Mine's methane drainage wells. According to data provided by the Mine itself to the U.S. Environmental Protection Agency (EPA), the West Elk Mine emitted more than 4.4 million tons of carbon dioxide-equivalent of methane pollution over the period 2011 through 2016, making it the single largest industrial methane polluter in the State of Colorado during that period.

101.    Further mine expansion will guarantee years more methane pollution from West Elk, although future actual emissions are uncertain. The Leasing SFEIS notes that due to the lack of correlation between historic methane emissions at the West Elk Mine and production levels, "there is no clear relationship that would make it possible to accurately predict the amount of methane that will be released to the atmosphere during future mining operations." However, based on a continuation of existing emission levels during future mining operations, the Leasing SFEIS projected that the West Elk mine expansion would produce methane emissions for about 11 more years, resulting in climate impacts equivalent to approximately 11.9 million tons of $CO_2$ ($CO_2$-equivalent or $CO_2e$) emissions into the atmosphere, 2.5 million tons directly attributable to approval of the Mining Plan.

### 3.   Indirect Climate Impacts

102.    The reasonably foreseeable combustion of the 17.6 million tons of coal to be extracted under the Mining Plan could result in up to 45.5 million additional tons of $CO_2$ pollution, further accelerating the damaging impacts of climate change.

103.    When the impacts of methane pollution and coal combustion are combined, the West Elk Mine could be responsible for as much as 48 million tons of $CO_2e$ in greenhouse gas pollution over the 2.7 years Federal Defendants predict it will take Arch to complete mining under the Mining Plan.

104.    On an annual basis, direct emissions and indirect emissions from the West Elk mine expansion will contribute as much as 17.8 million tons of $CO_2e$ in greenhouse gas pollution to the atmosphere.

105.    The NEPA analysis for the 2017 rulemaking that opened up the Sunset Roadless Area to roadbuilding ("Rulemaking SFEIS") contained an attempt to analyze the greenhouse gas pollution and the social cost of carbon related to those emissions. The Rulemaking SFEIS concluded the social cost of opening to mining the 172 million tons of coal within the North Fork Coal area could be more than $13.7 billion, with a negative *net* social cost (accounting for economic benefits of expanded coal mining) of more than $12 billion. With the West Elk Mine expansion opening up coal reserves of about 10% of the North Fork Coal area total, the net social cost of expanding the mine is likely more than $1 billion. Yet even that high figure likely underestimates the project's actual climate costs because the Forest Service arbitrarily omitted the social cost of climate pollution from methane venting from its calculations, and the social

cost values relied upon by the agency do not take into account the catastrophic climate consequences now projected for warming above 1.5°C.

### 4. Cumulative Climate Impacts

106.    The Leasing SFEIS adopted by Federal Defendants provides no quantitative assessment of the cumulative climate impacts of the West Elk mine expansion in conjunction with any other Federal or non-Federal actions. Instead, the Leasing SFEIS presented only a cursory "qualitative discussion of the environmental effects of climate change," and "used estimated GHG emissions associated with the proposed action" standing alone as a "proxy" for the effects of climate change. Leasing SFEIS, at 122. Accordingly, Federal Defendants have never considered the *cumulative* effects on climate change resulting from the incremental impact of the West Elk expansion "when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.

107.    Given the importance of the Federal Coal Program in driving coal production, greenhouse gas emissions, and climate change, NEPA requires that OSM consider the impacts of other past, present, and future federal coal activities to take a hard look cumulative impacts of the West Elk Mine expansion. In the United States, coal deposits owned by the American public and managed by the U.S. Department of the Interior supply a significant portion of the nation's coal, approximately 90% of which is used for electricity generation, according to the U.S. Energy Information Administration ("EIA"). Since 2003, the EIA reports that approximately 40% of the

nation's coal has come from publicly owned deposits.[2] Virtually all publicly owned coal is found in the Rocky Mountain west.

108.    As noted above, in 2018, USGS inventoried greenhouse gas emissions associated with coal and oil and gas production on federal lands, revealing that federal fossil fuel production amounts to 23% of all U.S. carbon dioxide emissions and to nearly 25% of all U.S. greenhouse gas emissions. Federal lands in Colorado, in particular, contributed about 4% of total $CO_2$ emissions and 13% of total methane emissions from federal lands. Total greenhouse gas emissions from federal lands in Colorado totaled more than 55 million metric tons of CO2e.

109.    The West Elk Mine expansion is projected to result in annual $CO_2e$ emissions of 17.8 million tons, representing more than 30% of total emissions from federal lands in Colorado, which already constitute a significant portion of total national emissions. Yet BLM has failed to assess the cumulative climate impacts of West Elk in conjunction with emissions resulting from these other federal actions.

110.    In the past two years, since BLM issued the West Elk lease modifications supplemental final EIS, the federal government has also either proposed or authorized a number of similar federal coal leasing and mining approvals that cumulatively impact the environment, particularly in terms of climate. As with the approval of the West Elk Mining Plan, these proposals and authorizations have come as part of the implementation of the federal coal program.

---

[2] EIA, "Sales of Fossil Fuels Produced from Federal and Indian Lands, FY 2003 through FY 2004" at 2 (2015), available at: http://www.eia.gov/analysis/requests/federallands/pdf/eia-federallandsales.pdf (last accessed May 30, 2019).

111.    Such specific similar proposals and authorizations posing cumulative impacts

include, but are not limited to:

- OSM's approval of a mining plan modification for the Bull Mountains mine in Montana (MTM-97988). The decision, on August 3, 2018, expanded the mine by 1,835 acres containing 28.5 million tons of coal. https://www.wrcc.osmre.gov/initiatives/bullMountainsMine.shtm

- OSM's pending proposal to approve an expansion of the Caballo mine in Wyoming's Powder River Basin by 1,024 acres containing 98.6 million tons of coal (WYW-172657). https://www.wrcc.osmre.gov/initiatives/caballoMine.shtm

- OSM's pending proposal to approve an expansion of the Dry Fork Mine in Wyoming's Powder River Basin by 640 acres containing 58.1 million tons of coal (WYW-0311810). https://www.wrcc.osmre.gov/initiatives/dryForkMine/dryForkMineA3EA.shtm

- BLM's proposal to offer for sale and issuance the Alton coal lease (UTU-081895), a 30.8 million ton coal lease containing 2,109 acres in southern Utah. (DOI-BLM-UT-C040-2015-0011-EIS). The lease was approved for sale and issued on February 14, 2019.

- BLM's proposal to offer for sale and issuance three separate coal leases at the Antelope mine in Wyoming's Powder River Basin. A 13.63 million ton coal lease containing 857 acres was approved for sale and issued on February 1, 2018 (WYW-177903; DOI-BLM-WY-P000-2013-0147-EA). BLM is also currently undergoing a NEPA review process for a 441 million ton coal lease at the Antelope Mine containing 3,508 acres which has not yet been sold or issued (WYW-184599; DOI-BLM-WY-P000-2016-0003-EIS).

- BLM's proposal to modify two coal leases (MTM-108494 and MTM-101099) to expand the Decker coal mine in the Powder River Basin of Montana by 220 million tons of coal and 2,685 acres. (DOI-BLM-MT-C020-2016-0018-EA). The lease modifications are currently under review by the BLM.

- BLM's proposal to modify the Pollyanna #8 coal lease (OKNM-91190), a 3.37 million ton coal lease expansion containing 520 acres in Oklahoma. BLM approved the lease expansion on May 25, 2018.

- BLM's proposal to modify the SUFCO coal lease (UTU-84102), a 5.85 million ton coal lease expansion covering 740 acres. BLM approved the lease modification on February 14, 2019.

- The coal lease application currently pending before BLM for the King II mine (COC-078825), a 6.8 million ton coal lease covering 3,182.07 acres in Colorado. https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=175460

- The coal lease application currently pending before BLM for the Twenty-mile mine (COC-078825), a 5.2 million ton coal lease covering 640 acres in Colorado. https://eplanning.blm.gov/epl-front-office/eplanning/planAndProjectSite.do?methodName=dispatchToPatternPage&currentPageId=124550

- The coal lease application currently pending before BLM for the Coyote Creek mine (NDM 110277), a 4.91 million ton coal lease covering 320 acres in North Dakota. https://eplanning.blm.gov/epl-front-office/eplanning/projectSummary.do?methodName=renderDefaultProjectSummary&projectId=114011

- The coal lease application currently pending before BLM for the Walker Flat mine (UTU-093214), a coal lease of unknown tonnage covering 2,236 acres.[3]

- The two coal lease modifications currently pending before BLM for the Lila Canyon mine (UTU-014218, UTU-126947), a 2.4 million ton coal lease covering 317 acres and a 6.7 million ton lease covering 1,252 acres, respectively, in Utah.[4]

- The coal lease application currently pending before BLM for the NA mine (WVES-59357), a 21.9 million ton coal lease covering 6,384 acres in West Virginia.[5]

112.    In addition, BLM has approved lease readjustments pursuant to 43 C.F.R. § 3451, effectively renewing and extending the life of additional existing coal leases.

113.    BLM also failed to consider any other activities that also cumulatively contribute to climate impacts when added to greenhouse gas emissions resulting from the West Elk

---

[3] BLM, Lifting the Pause on the Issuance of New Federal Coal Leases for Thermal (Steam) Coal Environmental Assessment, DOI-BLM-WO-WO2100-2019-0001-EA, at 7 tbl. 2.3 (2019), available at: https://eplanning.blm.gov/epl-front-office/projects/nepa/122429/173355/210563/Lifting_BLM_Coal_Leasing_Pause_EA.pdf.
[4] *Id.*
[5] *Id.*

expansion. For example, Federal Defendants have never assessed the cumulative impacts from the significant greenhouse gas emissions resulting from ongoing coal mining and oil and gas development and the transportation and combustion of these fossil fuels, in the United States generally and more specifically in the State of Colorado, and on both Federal and non-Federal lands.

114.    For example, over the past few years, there has been significant oil and gas development on federal lands in Colorado, resulting in large amounts of greenhouse gas emissions that cumulatively contribute to climate change. Since the Leasing SFEIS was issued, BLM has sold oil and gas leases covering nearly 100,000 acres of federal public lands in Colorado. BLM is already proposing to sell an additional 78,000 acres of Colorado public lands at its September 2019 lease sales.

- In September 2017, BLM sold 3 parcels totaling 403.808 acres in Colorado.

- In December 2017, BLM sold 23 parcels totaling 22,073.11 acres in Colorado.

- In March 2018, the BLM sold 4 parcels totaling 1,400 acres in Colorado.

- In June 2018, BLM sold 59 parcels totaling 50,572.56 acres in Colorado.

- In September 2018, BLM sold 20 parcels totaling 8,159.98 acres in Colorado.

- In December 2018, BLM sold 20 parcels totaling 7,847.250 in Colorado.

- In March 2019, BLM sold 5 parcels totaling 1,055.150 acres in Colorado.

- In June 2019 lease sale, BLM sold 17 parcels totaling 8,1776.8 acres in Colorado.

- For its September 2019 lease sale, BLM is proposing to sell 83 parcels totaling 78,691.07 acres in Colorado.

115.    In combination with the West Elk Mine expansion and other federal and non-federal coal development across the West, development of these federal oil and gas leases will

cumulatively contribute significant amounts of greenhouse gas emissions to the atmosphere and accelerate climate change.

116.    Before approving the Mining Plan, Federal Defendants did not analyze the cumulative climate impacts of their approval of the Mining Plan in conjunction with any other past, present, or future activities. Federal Defendants were required to do so under NEPA.

**V.    The Methane Mitigation Alternative**

117.    For years, Conservation Groups have argued that the permitting agencies needed to provide detailed consideration of a methane mitigation alternative that would require Arch to adopt measures designed to limit the amount of methane – a potent greenhouse – emitted into the atmosphere. In formal objections to the Forest Service's approval of the Lease Modifications, Conservation Groups provided evidence that flaring methane emitted from methane drainage wells is a reasonable way to mitigate the mine's climate impacts. This evidence included an expert report from Raven Ridge LLC which demonstrated that flaring of vented methane – an action Arch has long refused to adopt, and that federal agencies have long refused to analyze in detail – was a practical and cost-effective alternative. Nonetheless, the Forest Service declined to analyze such an alternative in detail, anticipating that analysis of methane mitigation, including flaring, would occur later in the process once the Mining Plan was available.

118.    In its ROD approving the lease modifications, the Forest Service explained that flaring was not considered in detail "because it, like all other methane mitigation measures, requires detailed engineering and economic considerations that would occur later in the process."

119.    Similarly, the Forest Service explicitly rejected flaring and other methane

mitigation measures as premature at the lease modification stage since, at that time, Arch still

needed to go through a site-specific mine permitting process, including mining plan approval:

> Consideration of all these potential methane mitigation measures relies on site-specific exploration data yet to be authorized based on this analysis, data collected and resultant engineering designs for: 1) mining, 2) safety and finally 3) mitigation technology possibilities. These engineering designs would become part of the subsequent State or OSMRE mine permitting processes and MSHA ventilation plan process. Followed by other agencies issuing permits to mine. While opponents to this project would say we "can't kick the can down the road" because of global climate change concerns, the staged process under several authorizing agencies, with defined roles and permitting stages, does not lend itself well to prescribing specific mitigation measures for activities that have not been proposed yet. . . . It is highly unlikely that one of these technologies would be applied until such time as mine-specific operational parameters are known for the lease modifications such as could occur after lease modifications are issued. . . .

Leasing SFEIS, at 55-56.

120.    The Forest Service responded to public comment requesting assessment of a

methane flaring alternative as follows:

> We do not speculate whether this method is infeasible or uneconomical, leasing is just not the appropriate time to address potential permitting actions that relate to in-mine safety for which no mine plan or ventilation plan has been prepared.

Leasing SFEIS, at 971.

121.    In Conservation Groups' legal challenge to the Forest Service's issuance of the

Leasing SFEIS and approval of the lease modifications, Judge Brimmer accepted the agencies'

argument that considering flaring was "premature" at that time, and that such analysis could wait

until later in the decision-making process:

> The determination whether a particular site-specific analysis can wait until a later decisionmaking stage is a "fact-specific inquiry" that is "tied to the existing environmental circumstances, not to the formalities of agency procedures." *See New Mexico ex rel. Richardson*, 565 F.3d at 718. The Court finds that the Agencies' determination that, even if methane flaring can be shown to be economically feasible,

detailed consideration of whether methane flaring should be used in the West Elk Mine would be more appropriate at a later date because it "requires detailed engineering and economic considerations" available at later stages in the process does not constitute a NEPA violation.

*High Country Conservation Advocates v. United States Forest Serv.*, 333 F. Supp. 3d 1107, 1124

(D. Colo. 2018).

122.    Similarly, in the ongoing appeal of the leasing modification decisions, attorneys

from the U.S. Department of Justice recently argued to the Tenth Circuit that methane mitigation

measures, including flaring, were best evaluated "in a staged decision-making process."

Answering Brief for the Federal Appellees, *High Country Conservation Advocates v. U.S. Forest*

*Serv.*, No. 18-1374, Doc. No. 010110139059 (10th Cir. Mar. 14, 2019). As the government's

lawyers articulated:

> For example, the [Leasing] SFEIS explained that requiring a specific mitigation measure at the leasing stage would not be prudent due to underground mine safety issues that would only become known at the mining stage. See FSLeasingII-000109 (noting safety issues posed by methane flaring). It is at this stage that mining companies, including MCC, would prepare mining and ventilation plans for review by the Mine Safety and Health Administration, which as the permitting agency determines whether mine safety standards have been or will be met.

*Id.*

123.    In other words, the Government recently represented to the Tenth Circuit that

critical "underground safety issues … would only become known at the mining stage," and that

there would be further evaluation at the mining stage of whether methane flaring or other

mitigation could be safely implemented. *Id.* But Arch has never been required to present a

methane mitigation plan to MSHA, has not done so to date, and OSM has now declined to

require any further review of methane mitigation, including flaring.

124.    With the Mining Plan and Ventilation Plan now in hand, Federal Defendants have all the information needed to finally fully assess the feasibility and cost-effectiveness of methane flaring at the West Elk Mine. The government passed the buck at the leasing stage and assured the public and the court that analysis of methane flaring would happen once a site-specific Mining Plan was available. But now that such a Mining Plan is available, the government asserts that the prior analysis – which lacked detailed consideration of methane flaring – is somehow good enough. But if Federal Defendants are not required to consider methane flaring now, then methane flaring will never be analyzed.

125.    OSM's Record of Decision further shows the arbitrary and capricious nature of Federal Defendants' decision to not fully consider a methane mitigation alternative at the mining plan stage. OSM states that it "reviewed the Alternative of Methane Flaring as described by the Commenters and agree with USFS and the BLM's determination that this alternative is not technically or economically feasible ([Leasing] SFEIS Section 2.3.7.5)." This statement, however, misrepresents the Leasing SFEIS's conclusion, which explicitly made no such determination regarding the technical or economic feasibility of methane flaring at the West Elk Mine. To the contrary, the Forest Service specifically stated: "We do *not* speculate whether this [methane flaring] method is infeasible or uneconomical, leasing is just not the appropriate time to address potential permitting actions that relate to in-mine safety for which no mine plan or ventilation plan has been prepared." (emphasis added). In approving the Mining Plan, Federal Defendants were arbitrary and capricious to rely upon a supposed finding in the leasing SFEIS that methane flaring was not technically or economically feasible where no such finding was ever made.

126.    Federal Defendants were required to take a hard look and consider a methane

mitigation alternative before the agency authorized the Mining Plan and allowed Arch Coal to

begin mining activities. Federal Defendants' authorization of coal mining at West Elk is

therefore unlawful unless and until Federal Defendants conduct this required analysis.

## CLAIMS FOR RELIEF

### First Claim for Relief
**Violation of NEPA—Failure to Analyze Alternatives to Reduce Methane Pollution
from the Expansion of the West Elk Mine**

127.    Each and every allegation set forth in this petition is incorporated herein by

reference.

128.    NEPA requires federal agencies, including OSM and the Department of the

Interior, to analyze a range or reasonable alternatives in EISs. 42 U.S.C. § 4332(2)(C), (E); 40

C.F.R. §§ 1502.14.

129.    NEPA requires federal agencies, including OSM and the Department of Interior,

to analyze mitigation measures in EISs. 40 C.F.R. §§ 1502.14(f), 1502.16(h), 1505.2(c).

130.    Because the Forest Service and BLM deferred analyzing a reasonable alternative

in the Leasing SFEIS that would require mitigation to reduce the methane pollution as a

condition of the agencies' approval of the Lease Modifications, Federal Defendants are required

to do this analysis before approving the West Elk Mining Plan.

131.    By adopting the Forest Service's Leasing SFEIS without conducting any

additional analysis of a methane mitigation alternative, despite the availability of a site-specific

Mining Plan and Ventilation Plan making such an assessment feasible and evidence showing that

methane flaring at West Elk would be cost-effective and practical, Federal Defendants failed to

analyze all reasonable alternatives before approving the Mining Plan. Because they relied on a supposed determination in the Leasing SFEIS that methane flaring was not technically feasible or cost-effective—a determination that was specifically *not* made in the Leasing SFEIS—Federal Defendants' refusal to consider a methane mitigation alternative prior to approving the Mining Plan was arbitrary and capricious.

132.    Federal Defendants' failure to analyze a range of reasonable alternatives and mitigation measures before approving the Mining Plan violates NEPA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

<u>Second Claim for Relief</u>
**Violation of NEPA—Failure to Provide Documentation Supporting Adoption of the Leasing SFEIS**

133.    Each and every allegation set forth in this petition is incorporated herein by reference.

134.    Where a federal agency adopts an EA or EIS under NEPA, the agency is required to provide "appropriate supporting documentation [] that [the adopted EA or EIS] adequately assesses the environmental effects of the proposed action and reasonable alternatives." 43 C.F.R. § 46.120(c). Such supporting documentation "must include an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." *Id*.

135.    In approving the West Elk Mining Plan, Federal Defendants adopted the existing Leasing SFEIS prepared by the Forest Service to support their decisions. Federal Defendants did not provide supporting documentation in their decision record for the Mining Plan approval

showing their evaluation of whether the Leasing SFEIS adequately analyzed the environmental impacts of coal mining pursuant to NEPA. Federal Defendants provided only cursory conclusions regarding whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects, but failed to adequately explain these conclusions.

136.    Specifically, Federal Defendants failed to provide supporting documentation evaluating whether new climate science, carbon budgeting information, information regarding the cumulative greenhouse gas emissions from fossil fuel production on federal lands, the existence of and risks to perennial springs and streams on the West Elk expansion area, and potential impacts to fish resulted in significantly different environmental effects from the Mining Plan than what was evaluated in the Leasing SFEIS.

137.    Federal Defendants' failure to provide appropriate documentation to support adoption of the Leasing SFEIS violates NEPA, 43 C.F.R. § 46.120(c), and was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of NEPA and the APA. 5 U.S.C. §§ 706(1), (2)(A).

### Third Claim for Relief
### Violation of NEPA—Failure to Take a Hard Look at the
### Cumulative Impacts to Climate

138.    Each and every allegation set forth in this petition is incorporated herein by reference.

139.    NEPA requires federal agencies to take a "hard look" at the environmental consequences of their actions. 42 U.S.C. § 4332. NEPA's implementing regulations require

Federal Defendants to consider and assess the direct, indirect, and cumulative environmental

impacts of mining activities at the West Elk Mine. *See* 40 C.F.R. § 1508.25(c)(3).

140.    In approving the West Elk Mining Plan, Federal Defendants adopted a pre-

existing NEPA document—the Leasing SFEIS prepared by the Forest Service—that did not take

a hard look at the reasonably foreseeable cumulative climate impacts of mining at the West Elk

mine in conjunction with other similar federal coal approvals and proposals. Federal Defendants

did not analyze the impacts of numerous federal coal leasing and mining plan actions, even

though such actions are cumulative in terms of their greenhouse gas emissions and similar in

terms of their climate impacts, timing, and geography. Nor did Federal Defendants consider the

cumulative impacts of the Mining Plan approval in conjunction with any other Federal or non-

Federal activities. Federal Defendants also failed to acknowledge important new climate science

and information regarding the cumulative impact of fossil fuel development on federal lands.

141.    Federal Defendants failure to take a hard look and analyze the cumulative climate

impacts of Mining Plan approval in conjunction with similar federal coal approvals is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of

NEPA and the APA. 5 U.S.C. §§ 706(1), (2)(A).

**Fourth Claim for Relief**
**Violation of NEPA—Failure to Take a Hard Look at Impacts to Water Resources and Fish**

142.    Each and every allegation set forth in this petition is incorporated herein by

reference.

143.    NEPA requires federal agencies to take a "hard look" at the environmental

consequences of their actions. 42 U.S.C. § 4332. NEPA's implementing regulations require

Federal Defendants to consider and assess the direct, indirect, and cumulative environmental impacts of mining activities at the West Elk Mine. *See* 40 C.F.R. § 1508.25(c)(3).

144.    In approving the West Elk Mining Plan, Federal Defendants adopted a pre-existing NEPA document—the Leasing SFEIS prepared by the Forest Service—that did not take a hard look at the reasonably foreseeable impacts of mining at the West Elk mine to newly-identified perennial springs and streams on the mining expansion area.

145.    The Leasing SFEIS concluded that "[t]here are no known perennial springs for the lease modification areas," and projected that impacts to non-perennial springs would be negligible, as "no loss of water is anticipated." Based on new hydrologic information, noted in OSM's Determination of NEPA Adequacy, Federal Defendants now acknowledge that "it is likely that there *are* perennial springs" within the mine expansion area. (emphasis added). Similarly, the new hydrologic information indicated that South Prong Creek and Horse Creek were in fact perennial and intermittent streams, not ephemeral streams as posited by the Leasing SFEIS. Further, Federal Defendants now recognize that "[p]otentially some of the springs and seeps in the lease modification area could see a reduction or loss of flow due to the proposed longwall mining based on hydrographs in the 2016 report."

146.    Based on its assumption that there were no perennial springs or streams at the mine expansion area, the Forest Service did not assess impacts to fish in the Leasing SFEIS. In adopting the Leasing SFEIS without independently assessing whether dewatering newly-identified perennial springs could potentially affect native or other fish species, Federal Defendants ignored an important aspect of the problem, in violation of NEPA.

147.    By simply identifying a potential risk to newly-identified perennial springs

without assessing the hydrologic and ecological importance of the springs or evaluating the

significance of the potential impacts to these important resources, Federal Defendants failed to

take a hard look at potential impacts to water resources and fish associated with expanding the

West Elk Mine.

148.    Federal Defendants failure to take a hard look at the impacts to water resources

and fish from their approval of the Mining Plan is "arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law," in violation of NEPA and the APA. 5 U.S.C. §§

706(1), (2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court:

A.    Declare that Federal Defendants violated NEPA by approving the 2019 West Elk

Mining Plan;

B.    Vacate the West Elk Mining Plan approvals to the extent they authorize coal

mining activities;

C.    Remand the West Elk Mining Plan approval to Federal Defendants for

compliance with NEPA;

D.    Enjoin Federal Defendants from re-issuing the West Elk Mining Plan approval

until such time as they have demonstrated compliance with NEPA;

E.    Grant Conservation Groups their costs of litigation including reasonable

attorneys' fees as provided by the Equal Access to Justice Act, 28 U.S.C. § 2412;

and

F.    Grant Conservation Groups such additional and further relief as the Court deems

just and proper.


Respectfully submitted July 2, 2019.

s/ Daniel L. Timmons                          s/ Samantha Ruscavage-Barz
Daniel L. Timmons                             Samantha Ruscavage-Barz
WildEarth Guardians                           WildEarth Guardians
516 Alto Street                               516 Alto Street
Santa Fe, NM 87501                            Santa Fe, NM 87501
(505) 570-7014                                (505) 401-4180
dtimmons@wildearthguardians.org               sruscavagebarz@wildearthguardians.org

*Attorneys for Petitioner WildEarth Guardians*


s/ Nathaniel Shoaff
Nathaniel Shoaff
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5610
nathaniel.shoaff@sierraclub.org


*Attorney for Petitioners High Country Conservation Advocates, Center for Biological Diversity,
Sierra Club, and Wilderness Workshop*