IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 19-cv-001920-RBJ

WILDEARTH GUARDIANS,
HIGH COUNTRY CONSERVATION ADVOCATES,
CENTER FOR BIOLOGICAL DIVERSITY,
SIERRA CLUB, and
WILDERNESS WORKSHOP,

  Petitioners,

v.

DAVID L. BERNHARDT, in his official capacity as United States Secretary of the Interior,
UNITED STATES OFFICE OF SURFACE MINING RECLAMATION AND
ENFORCEMENT,
JOSEPH BALASH, in his official capacity as Assistant Secretary of Land and Minerals
Management, U.S. Department of Interior,
GLENDA OWENS, in her official capacity as Acting Director of U.S. Office of Surface Mining
Reclamation and Enforcement, and
DAVID BERRY, in his official capacity as Regional Director of U.S. Office of Surface Mining
Western Region,

  Respondents,

---

ORDER

---

  In this case before the Court, the plaintiff environmental organizations seek judicial

review of a decision by the Office of Surface Mining Reclamation and Enforcement ("OSM").

The decision recommended that the Secretary of Interior approve a mining plan authorizing the

mining of federally owned coal on public lands by defendant Mountain Coal Company

("MCC").  Mining is scheduled to begin in January of 2020 in a part of the North Fork Valley

called the Sunset Roadless Area.  Plaintiffs allege that the agency decision failed to comply with

the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act

("APA") and must be set aside. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-706.

## BACKGROUND

### A. The National Environmental Policy Act ("NEPA")

The National Environmental Policy Act does not prescribe any substantive environmental standards per se. Rather NEPA is a procedural statute designed to ensure public participation and transparent decision-making by federal agencies. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Before taking major action, NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS"). 42 U.S.C. § 4332(2)(C). An EIS must take a "hard look" at the potential environmental impacts of the agency's proposed action, including direct, indirect, and cumulative impacts. *Robertson*, 490 U.S. at 350; *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 713 (10th Cir. 2009).

"The EIS must also 'rigorously explore and objectively evaluate all reasonable alternatives' to a proposed action in comparative form, so as to provide a 'clear basis for choice among the options.'" *WildEarth Guardians v. U.S. Forest Serv.*, 828 F. Supp. 2d 1223, 1236 (D. Colo. 2011) (quoting 40 C.F.R. § 1502.14). "Reasonable alternatives are those which are 'bounded by some notion of feasibility,' and, thus, need not include alternatives which are remote, speculative, impractical, or ineffective." *Id.* at 1236-37 (quoting *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1172 (10th Cir. 2002) and citing *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1039-40 (10th Cir. 2001)). "The EIS also must briefly discuss the reasons for eliminating any alternative from detailed study." *Id.* (citing 40 C.F.R. § 1502.14(a)).

Under NEPA, an agency may adopt pre-existing NEPA analyses prepared by other agencies. 43 C.F.R. § 46.120(c). The adopting agency must determine, "with appropriate supporting documentation, that it adequately assesses the environmental effects of the proposed action and reasonable alternatives." *Id*. Supporting documentation "must include an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." *Id*. To determine whether alleged deficiencies in an EIS merit reversal, the Court applies "a rule of reason standard (essentially an abuse of discretion standard)." *Utahns for Better Transp.*, 305 F.3d at 1163.

## B. The Mineral Leasing Act ("MLA") and Surface Mining Reclamation and Control Act ("SMRCA")

The MLA allows the Secretary of the Interior to lease federal coal resources. *See* 30 U.S.C. §§ 181, 201. The Bureau of Land Management ("BLM") largely implements this function. The MLA also authorizes the Secretary to approve proposed mining, but if that action "might cause significant disturbance of the environment," the operator must submit a plan to the Secretary for approval. 30 U.S.C. § 207(c). OSM has been charged with preparing and submitting to the Secretary a decision document "recommending approval, disapproval or conditional approval of the mining plan." 30 C.F.R. § 746.13.

Under the SMRCA, OSM must base its recommendation on, among other things, information prepared in compliance with NEPA, "comments and recommendations or concurrence of other federal agencies, as applicable, and the public," "findings and recommendations of the Bureau of Land Management with respect to the resource recovery and

protection plan and other requirements of the lease and the Mineral Leasing Act." 30 C.F.R. §
746.13.

### C. <u>The Sunset Roadless Area</u>

Until recently, the Sunset Roadless Area contained 5,800 acres of undeveloped forest and
scrub land in a part of western Colorado called the North Fork Valley. Mount Gunnison and the
West Elk Wilderness lie to the east. In *High Country Conservation Advocates v. United States
Forest Serv. (High Country I)*, I described this area as "undoubtedly wild, relatively empty, and
home to diverse flora and fauna." 52 F. Supp. 3d 1174, 1183 (D. Colo. 2014). In addition to
serving as a habitat for numerous species of wildlife, the area also draws recreational visitors.
*Id*.

Next door to the Sunset Roadless Area sits the West Elk coal mine. This underground
mine has been operating since 1981, mostly beneath public lands managed by the Forest Service.
See *High Country I*, 52 F. Supp. 3d 1174. Since that case was decided, coal exploration
activities began in late 2018, and construction of mining sites in the Sunset Roadless Area has
commenced.

As MCC continues to expand into the Sunset Roadless Area under the new mining plan,
it will build approximately 8.4 miles of new roads and install 43 methane drainage wells
throughout this natural landscape. MCC's methane drainage wells will release methane, a
powerful greenhouse gas, directly into the atmosphere. The United States Forest Service
("USFS") estimated that the total methane released from the proposed expansion would be
approximately 11.91 million tons. AR 000320.

### D. **The Parties**

Plaintiffs in this case are a collection of non-profit environmental groups who identify as "conservation groups." ECF No. 1 at 4. Plaintiff WildEarth Guardians is a non-profit organization "dedicated to protecting and restoring the wildlife, wild places, and wild rivers throughout the American West." *Id*. at 4–5. Since 1977, Plaintiff High Country Conservation Advocates has operated in the Gunnison area, working to address issues "that affect Gunnison County's clean air, clean water, public lands, and health wildlife." *Id*. at 5. Plaintiff The Center For Biological Diversity is a non-profit environmental organization that "uses science, policy, and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive." *Id*. Plaintiff Wilderness Workshop is a Colorado-based non-profit "engaged in research, education, legal advocacy and grassroots organizing to protect the ecological integrity of local public lands." *Id*. at 6. Members of these organizations recreate in the Sunset Roadless Area and nearby public lands; they visit for the opportunity to enjoy the solitude and quiet of the area as well as the opportunity to hike, camp, and observe wildlife. *Id.*

Plaintiff Sierra Club is a national environmental non-profit group that shares similar conservation goals as the other plaintiffs in this case. In addition, the Sierra Club is dedicated to "practicing and promoting the responsible use of the Earth's resources and ecosystems." *Id.*

Most of these groups participated in the public comment process associated with agency approvals of modifications to the West Elk mine lease and the coal exploration plan of portions of the Sunset Roadless Area. *See High Country I*, 52 F. Supp. 3d 1174 *and High Country Conservation Advocates v. U.S. Forest Serv. (High Country III)*, 333 F. Supp. 3d 1107 (D. Colo. 2018) (decision currently on appeal). Conservation groups subsequently brought multiple suits

against BLM and USFS for their failure to comply with NEPA in those decisions. *Id*. Though OSM did not solicit public comments prior to its approval of the mining plan at issue in this case, conservation groups submitted an unsolicited letter registering concerns regarding OSM's proposed action.

The defendants come from two groups. First there are the federal defendants, Secretary of Interior David Bernhardt, OSM, David Berry, Regional Director of OSM's western region, Glenda Owens, Director of OSM, Joseph Balash, Assistant Secretary of Land and Minerals Management of the Department of Interior. ECF No. 1 at 8. OSM's decision to recommend approval of the mining plan is the basis of this action.

Second, there is MCC. MCC, a subsidiary of Arch Coal, owns leases in West Elk Mine and petitioned OSM for the mining plan approving its expansion of the West Elk Mine. After this suit was filed, MCC filed an unopposed motion to intervene as a respondent, claiming its "clear entitlement to intervention as of right." ECF No. 11 at 2. The motion was granted on July 8, 2019. ECF No. 18.

### E. **The Agency Decision**

The decision challenged here is OSM's recommendation that the Assistant Secretary of Land and Minerals Management approve the proposed mining plan and OSM's accompanying record of decision ("ROD") explaining its recommendation. AR 000004; AR 000014–37. The challenge also significantly implicates OSM's NEPA Adequacy Review Form (NARF) in which it evaluated the proposed action's compliance with NEPA. AR 000038–44. Before recommending approval, OSM did not release draft documents for public review or hold a formal public comment period. The decision and the supporting ROD incorporated by reference other agencies' environmental analysis documents in order to comply with NEPA. In particular,

OSM adopted and heavily relied on the findings made in USFS's "supplemental and final" EIS ("SFEIS") made in response to this Court's ruling in *High Country II*.[1]  AR 000038; AR 000015.

## PROCEDURAL BACKGROUND

Though plaintiffs initiated this suit in July of 2019, this case has an extensive history going back to 2009.  MCC first sought to expand the West Elk mine in 2009.  In 2012 and 2013, USFS and BLM issued several decisions allowing the expansion to move forward.  In 2012 USFS adopted the Colorado Roadless Rule which included an exception for the North Fork Coal Mining Area allowing the construction of temporary coal mine roads in the Sunset Roadless Area, among other areas.  77 Fed. Reg. 39,576, 39,576 (July 3, 2012).  *Id.*  Also in 2012, USFS consented to, and BLM subsequently approved of, proposed lease modifications to MCC's lease of the West Elk mine.  *High Country I*, 52 F. Supp. at 1184.  In 2013, BLM approved a coal exploration plan.  *Id.* at 1185.

In 2014, conservation groups challenged these actions in *High Country Conservation Advocates v. U.S. Forest Service* (*High Country II*), 67 F. Supp. 3d 1262 (D. Colo. 2014).  This Court found that several agency decisions violated NEPA by failing to account for the environmental costs of the action in their cost/benefit analysis.  *Id.* at 1195–97.  This Court vacated the exploration plan as well as the lease modifications, and MCC was enjoined from actions taken pursuant to those decisions.  *Id.* at 1266–67.

In 2017, the agencies began again.  BLM and USFS reinstated the coal mine exception to the Colorado Roadless Rule, 82 Fed. Reg. 9,973-01 (Feb. 9, 2017), and initiated proceedings to lease a portion of the Sunset Roadless area to MCC.  They also issued the SFEIS, which

---

[1] The SFEIS was prepared by USFS with participation from BLM as a cooperating agency.  Both agencies relied on it extensively in their decisions regarding the West Elk lease modification.  AR 003356–003418; AR 003327–003355.

contained new analysis conducted in attempted compliance with the decision in *High Country II*.

AR 000190.  Conservation groups again challenged these and other related agency actions in

*High Country III*, 333 F. Supp. 3d 1107 (D. Colo. 2018).  The district court upheld the agency

actions, and conservation groups appealed to the Tenth Circuit.  *High Country Conservation*

*Advocates v. U.S. Forest Serv.,* No. 18-1374 (10th Circuit appeal filed Sept. 11, 2018).

Following *High Country III*, OSM recommended the approval of MCC's proposed

mining plan and issued an ROD explaining its decision.  AR 000004; AR 000014–000037.  With

mining scheduled to begin in early 2020, plaintiffs filed this suit.  The Court granted MCC leave

to intervene in the case on July 8, 2019. Plaintiff's filed their opening brief on August 19, 2019.

Oral arguments on the merits were heard before this Court on October 17, 2019.

## ANALYSIS

By law, this Court may only set aside an agency decision if after a review of the entire

administrative record the Court finds that the decision was "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see also Davis v.*

*Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002).

> An agency's decision is arbitrary and capricious if the agency (1) entirely failed to
> consider an important aspect of the problem, (2) offered an explanation for its
> decision that runs counter to the evidence before the agency, or is so implausible
> that it could not be ascribed to a difference in view or the product of agency
> expertise, (3) failed to base its decision on consideration of the relevant factors, or
> (4) made a clear error of judgment.  Deficiencies in an EIS that are mere "flyspecks"
> and do not defeat NEPA's goals of informed decisionmaking and informed public
> comment will not lead to reversal.

*New Mexico ex rel. Richardson*, 565 F.3d at 704 (internal quotation marks and citations omitted).

Plaintiffs bear the burden of proof on the question of whether an agency's decision was arbitrary

or capricious.  *Citizen's Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir.

2008) (noting that the agency's decision is presumed valid).  The agencies' decisions—as long as

they are neither arbitrary nor capricious—are entitled to deference, and this Court cannot substitute its own judgment for the agency's.  *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 555 (1978).  Deference to the agency is also "especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise."  *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1246 (10th Cir. 2011) (quoting *Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677, 691 (10th Cir. 2010)).  But as I noted in *High Country I*, the Court will not "defer to a void."  *Oregon Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010).  "In addition to requiring a reasoned basis for agency action, the arbitrary or capricious standard requires an agency's action to be supported by the facts in the record."  *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994).  "An agency's decision, therefore, is arbitrary if not supported by 'substantial evidence.'"  *High Country III*, 333 F. Supp. 3d at 1119 (quoting *Olenhouse*, 42 F.3d at 1575).

Plaintiffs allege three NEPA violations in OSM's approval of the mining plan and accompanying ROD: (A) OSM failed to consider an alternative to the proposed action that would require MCC to flare methane emissions, (B) OSM did not take a hard look at the cumulative impacts on climate change from mine expansion in the context of other OSM and Department of Interior activities, and (C) OSM did not take a hard look at the direct impacts to water resources from mining activities.

A.  **The Methane Flaring Alternative**

1.  Waiver

Preliminarily, defendants argue that conservation groups waived their objections to the agencies' definition of economic feasibility.  ECF No. 29 at 17.  "Plaintiffs must exhaust available administrative remedies before the USFS prior to bringing their grievances to federal

court.  To satisfy the exhaustion requirement, plaintiffs generally must structure their participation so that it alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration.  Claims not properly raised before an agency are waived, unless the problems underlying the claims are 'obvious' or otherwise brought to the agency's attention."  *Forest Guardians v. U.S. Forest Serv.*, 641 F.3d 423, 430 (10th Cir. 2011) (citing 7 U.S.C. § 6912(e)5; 36 C.F.R. § 215.21) (internal quotations omitted).

Here, conservation groups' objections to the agencies' definition of economic feasibility constitutes a claim that must have been raised before USFS or BLM.  Yet they did not raise this argument at the leasing stage comment period.  As such, I find that conservation groups waived their argument regarding the definition of economic feasibility.

Though conservation groups waived the argument about the definition of economic feasibility, they did not waive the argument that the methane flaring alternative must be considered.  They raised this argument at every stage and opportunity afforded to them.  *See High Country III*, 333 F. Supp. 3d 1107.  Though conservation groups may not be able to argue economic feasibility should be defined differently, they are still free to argue, as they have repeatedly, that the agencies failed to properly evaluate the methane flaring alternative for other reasons, such as the lack of substantial evidence justifying OSM's conclusion.  Defendants have not provided an explanation as to how waiver of the definitional argument ameliorates the failings of the agencies' NEPA analysis regarding flaring.  *See* ECF No. 29 at 17-20.

2.  <u>The Argument is Not Issue or Claim Precluded</u>

Defendants next argue that the methane flaring argument is both issue and claim precluded, because conservation groups had the opportunity to successfully litigate this issue in

*High Country III* and did not.  ECF No. 30 at 14-15.  Though a methane flaring alternative was raised during *High Country III*, conservation groups argument is not precluded here.

Claim preclusion requires: (1) a judgment on the merits in the earlier action; (2) identity of parties in both suits; and (3) identity of causes of action in both suits.  *Yapp v. Excel Corp.*, 186 F.3d 1222, 1226 (10th Cir. 1999).  The Tenth Circuit applies the transactional approach in determining what constitutes identity of causes of action.  A claim is precluded when it arises "out of the same transaction, or series of connected transactions as a previous suit which concluded with a valid and final judgment."  *Id.* at 1227 (internal quotations omitted).  What constitutes the same transaction or series of transactions is "to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Id.*

Even assuming the parties are the same, and that *High Country III* constitutes a judgment on the merits, there is no identity of the cause of action between *High Country III* and the case at hand.  Respondents argue that conservation groups' current claim arose out of the SFEIS, the same transaction at issue in *High Country III*.  The methane flaring argument, defendants claim, is a failing of the SFEIS and "[p]etitioners had every opportunity in [*High Country III*] to demonstrate that the SFEIS was inadequate and did not succeed."  ECF No. 30 at 15.  This is incorrect in several ways.

First, in *High Country III* the court did not find that conservation groups had failed to demonstrate that the methane flaring analysis was insufficient.  Rather the court concluded that the agency reasonably postponed the analysis until a later date.  *High Country III* 333 F. Supp. 3d at 1126.  Second, the actions challenged in the case at hand occurred years after those in *High*

*Country III*, originate from OSM rather than USFS and BLM, and, though they adopt the SFEIS, draw significantly different conclusions about the alternative. Conservation groups' claim is that the actions incorrectly relied on the SFEIS to conclude that methane flaring was infeasible because the SFEIS had explicitly postponed such a conclusion. This claim did not exist at the time of *High Country III* because the mining plan and approval actions did not exist, and conservation groups were told that the flaring analysis would occur later. Because the claims do not arise out of the same transaction, there is no identity of causes of action, and the claim is not precluded.

Issue preclusion requires (1) a judgment on the merits in the earlier action, (2) that "the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication," (3) that "the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action," and (4) identity of issues in both suits. *Park Lake Res. Ltd. Liab. v. U.S. Dep't Of Agr.*, 378 F.3d 1132, 1136 (10th Cir. 2004). The fourth element, identity of issues, "is only satisfied when an issue is 'actually and necessarily determined' in a prior proceeding 'by a court of competent jurisdiction.'" *Equal Employment Opportunity Comm'n v. JBS USA, LLC*, 115 F. Supp. 3d 1203, 1220 (D. Colo. 2015) (quoting *Montana v. United States,* 440 U.S. 147, 159 (1979)).

The issue here, I think both parties would agree, is whether the agencies were required to consider methane flaring as an alternative to the proposed action -- in this case, the mining plan approval. This issue was not actually and necessarily determined in *High Country III*. In *High Country III* Judge Brimmer considered whether the agencies were required to consider methane flaring alternative at the *leasing stage*. He concluded that they reasonably delayed consideration until a later stage. Whether the agencies were required to consider the alternative at such a later

stage was not actually and necessarily determined. Just the opposite, judgment on this issue was postponed. Because there is no identity of issues, I find that the methane flaring issue is not precluded and the agency acted arbitrarily by failing to consider it.

### 3. Agency Consideration of the Methane Flaring Alternative

The methane flaring alternative required consideration that OSM failed to give. OSM cannot rely on environmental analysis conducted by other agencies, which were explicitly incomplete and postponed. Defendants argue both that the agencies reasonably excluded the alternative from consideration and, alternatively, that the methane flaring alternative was sufficiently considered at multiple junctions. Neither argument reflects the records the agencies made, and therefore they cannot hold water.

In an EIS, an agency must "present the environmental impacts of the proposal and the alternatives in comparative form." 40 C.F.R. § 1502.14. In doing so, it must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." *Id.*

OSM's ROD addresses the methane flaring alternative and attempts to quickly dispatch the issue. The ROD states that "the SFEIS sufficiently addressed the alternative of methane flaring." And contains a single additional paragraph discussing the methane flaring alternative. It reads:

> OSMRE reviewed the Alternative of Methane Flaring as described by the Commenters and agree with USFS and the BLM's determination that this alternative is not technically or economically feasible (SFEIS Section 2.3.7.5). In order for OSMRE to carry this alternative forward or include it as mitigation it would need detailed engineering information, approval from the Mine Safety and Health Administration (MSHA), and a determination that it was economically feasible. At this time, none of those criteria have been met. The mine ventilation plan submitted to CDRMS [Colorado Division of Reclamation, Mining and Safety] as part of the PAP [Permit Application Package] does not include information on how methane flaring would be technically feasible. Pursuant to its

lease stipulations, MCC submitted to the BLM a report on the economic feasibility of methane mitigation at the mine (SFEIS, Appendix B). The BLM reviewed the report and provided OSMRE the summary of that review which OSMRE has considered; however, OSMRE has independently reviewed and found no new information or significant changes to existing information that would warrant this alternative or mitigation to be carried forward at this time. The SFEIS contemplated that methane flaring could potentially reduce the total global warming potential of the gas by approximately 87%. (SFEIS Section 2.7.3.5). OSMRE understands the environmental benefit that would result from this mitigation. But the issues that remain regarding methane mitigation are not environmental in scope and thus do not require additional environmental analysis. The remaining issues are the technical and economic feasibility of the process and miner safety.

OSM ROD, AR 00035. OSM briefly notes a report submitted pursuant to MCC's lease, which parties refer to as the Resource Recovery and Protection Plan report ("R2P2"). OSM's NEPA Adequacy Review Form (NARF) does not discuss methane flaring, instead merely stating that the SFEIS environmental analysis was adequate. AR 00038-44.

The SFEIS contains three paragraphs describing the methane flaring alternative in broad terms. It states, among other things, that though there are currently no flaring operations at active coal mines in the United States, the technology is in use in other countries. AR 00268. It explains that MSHA approval would be required, and that MSHA has not yet been presented with an application to flare at an active mine site. AR 000269. However, it also notes that MSHA has "a process in place to analyze the safety aspects of any designs within an application," and that MSHA has authorized flaring systems for other types of mines (though noting the important difference in the combustibility of coal compared to trona). *Id.* Later, in response to a comment that the agencies must analyze methane flaring as an alternative, the SFEIS states "[w]e do not speculate whether this method is infeasible or uneconomical, leasing is just not the appropriate time to address potential permitting actions that relate to in-mine safety for which no mine plan or ventilation plan has been prepared." AR 001178.

a. <u>Methane Flaring is a Reasonable Alternative Requiring Consideration</u>

Conservation groups argue that methane flaring was a reasonable alternative requiring agency consideration under NEPA. Defendants argue that the alternative was reasonably found infeasible and therefore consideration was not required. Because the alternative met the criteria for a reasonable alternative, and neither USFS nor OSM reasonably concluded it was infeasible, the agencies were required to consider it.

Under *New Mexico ex rel. Richardson v. Bureau of Land Management*, an alternative is reasonable when it (1) "falls within the agency's statutory mandate," and (2) meets the "agency's objectives for a particular project." 565 F.3d 683, 709 (10th Cir. 2009). An otherwise reasonable alternative need not be considered if the agency finds it is "too remote, speculative, or impractical or ineffective." *Id.* at 708.

First, OSM has the authority to recommend that the Interior Secretary approve, disapprove, or approve with conditions, proposed mining plans. 30 C.F.R. § 746. The recommendation of approval, disapproval, or conditional approval must be based on, among other things, information prepared in compliance with NEPA. *Id.* Conservation groups argue this gives OSM the authority to condition approval of the mining plan on MCC's flaring of methane generated from the mine expansion. Defendants have not argued that requiring methane flaring, conditioned on MSHA approval, would fall outside OSM's statutory mandate. Thus I assume the first criterion is met.[2]

---

[2] This is supported by the Tenth Circuit's conclusion in *Richardson* that consideration of an alternative fell within BLM's statutory mandate because BLM was obligated to "observe the principle of multiple use," numerous members of the public had advocated for a "more protective alternative" which did not violate the multiple use principle, and BLM presented no additional reason for excluding the alternative from consideration. *Id.* at 709-10 ("Thus, an alternative that closes the Mesa to development does not necessarily violate the principle of multiple use, and the multiple use provision of FLPMA is not a sufficient reason to exclude more protective alternatives from consideration.").

Second, the alternative fits well within the agency objectives. OSM's ROD states that "the purpose of the Proposed Action is to evaluate the environmental effects of coal mining" and that the "need for this action is to provide [MCC] the opportunity to mine the Federal coal." AR 000019. Conservation groups argue that as a mitigation method of the environmental effects of the mine, the methane flaring alternative fit within the agency-stated objective. ECF No. 26 at 20. Evaluation of the alternative would fulfill the first purpose by providing "the public and decision-makers with the missing comparison of greenhouse gas emissions between a mandatory flaring alternative and the preferred alternative . . . while still allowing [MCC] the opportunity to mine the Federal coal." ECF No. 26 at 20-21. Again, defendants have not argued against this, and I accept conservation groups' argument.

Despite this, defendants claim that OSM, BLM, and USFS collectively excluded the alternative because "they could not say, with any confidence," that it was "feasible or realistic." ECF No. 30 at 16. I assume that they mean to argue that the alternative falls into the *Richardson* category of alternatives that fit the above criteria but are too remote, speculative, impractical, or ineffective. *See Richardson*, 565 F.3d at 708. This conclusion does not reflect the record. As shown above, OSM's ROD stated that it agreed with and relied on the SFEIS's conclusion that methane flaring was not "technically or economically feasible." AR 00035. However, the SFEIS does not draw this conclusion. As addressed above, the SFEIS specifically states that the agencies did not draw any conclusion about the feasibility or economy of the alternative, and instead noted that it was premature to address these issues at the leasing stage. AR 001178. In fact, defendants have admitted this in their briefs. ECF No. 30 at 21 ("Petitioners are correct that [USFS] and BLM did not make this finding."); ECF No. 29 at 15 ("Conservation Groups correctly state that SFEIS Section 2.3.7.5 did not affirmatively state that flaring was infeasible.").

Finally, defendants argue that though the SFEIS does not explicitly conclude that the alternative was infeasible, the agency implicitly drew this conclusion. As evidence defendants point to the placement of the methane flaring discussion in a section titled "Alternatives Considered but Eliminated from Detailed Study." ECF No. 29 at 15, AR 000260. Apparently, this placement suggests that agencies concluded methane flaring was infeasible and an unreasonable alternative that therefore could be eliminated from detailed study. This argument cannot stand. In response to public comments on the exact issue, the SFEIS explicitly states that the flaring should be considered at a later stage. AR 001178. Defendants cannot now point to that same document as evidence of the conclusion the alternative required no further consideration at any point. The commenters, possibly the conservation groups themselves, reasonably relied on the agencies' own statements that the alternative would be considered at a later stage. Given the agencies' insistence that a later stage would be more appropriate, the only reasonable conclusion is that the flaring alternative was "eliminated from detailed study," at the leasing stage because the agencies thought a later stage would be better.

This interpretation is supported both by USFS's own ROD and by prior law developed in this case. USFS released an ROD in conjunction with the SFEIS. It states "the SFEIS considers flaring as an alternative not considered in detail because it, like all other methane mitigation measures, requires detailed engineering and economic considerations that would occur later in the process." AR 003390. Additionally, in *High County III*, Judge Brimmer upheld the agency determination that "detailed consideration of whether methane flaring should be used in the West Elk Mine would be more appropriate at a later date because it 'requires detailed engineering and economic considerations' available at later stages in the process." *High Country III* 333 F. Supp. 3d at 1126 (quoting USFS ROD at AR 003390).

Defendants further argue that OSM relied not only on the SFEIS, but also on a report prepared and submitted by MCC as part of its lease stipulations. According to defendants, MCC's R2P2 justified OSM's conclusion that methane flaring wasn't "technically or economically feasible." AR 00035, ECF No. 30 at 19.

This claim is not supported by the record for two reasons. First, OSM opens its discussion of methane flaring by explicitly adopting the BLM and USFS's determinations in the SFEIS. AR 000035. OSM does not explicitly adopt or agree with the R2P2 assessment, but only discusses it later.

Second, OSM's statements do not suggest that the R2P2 informed their conclusions regarding the feasibility of flaring. Regarding the R2P2, OSM states only that "[p]ursuant to its lease stipulations, MCC submitted to the BLM a report on the economic feasibility of methane mitigation at the mine . . . . The BLM reviewed the report and provided OSMRE the summary of that review which OSMRE has considered; however, OSMRE has independently reviewed and found no new information or significant changes to existing information that would warrant this alternative or mitigation to be carried forward at this time." AR 000035. Essentially, OSM states that the R2P2 provided no new information altering the conclusion it already drew (erroneously) from the SFEIS.

In their briefs, defendants present new arguments in support of the conclusion that the alternative is infeasible or unreasonable, but these bear no weight. "We can only affirm agency action, if at all, on grounds articulated by the agency itself. Therefore, we consider this to be a post-hoc rationalization and do not consider it." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1165 (10th Cir. 2002), *as modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003).

Neither OSM nor BLM and USFS put on the record any conclusions that justify excluding methane flaring from consideration as an alternative. Instead, it appears that one agency drew a faulty conclusion on the basis of other agencies' explicit lack of conclusion.

    b.   <u>OSM Did Not Rigorously Explore and Objectively Evaluate Methane Flaring</u>

Given that OSM should have evaluated methane flaring, the next question is whether they did. A reasonable alternative must be "rigorously explore[d]" and "objectively evaluate[d]." 40 C.F.R. § 1502.14.(a). Conservation groups argue the agencies did not rigorously explore the methane flaring alternative, and defendants unsurprisingly argue that they did.

Defendants again rely on the OSM ROD and the SFEIS to show that the methane flaring alternative was sufficiently explored. First, the SFEIS: Defendants claim that though BLM and USFS explicitly reserved conclusions about methane flaring for a later date, the alternative was sufficiently evaluated within the document. ECF No. 30 at 16–19. As discussed above, SFEIS's discussion of flaring (Section 2.3.7.5, AR 000268-69) consists of three paragraphs and provides an overview of the proposal and some of the barriers including MSHA approval. It also indicates methods of overcoming those barriers. The SFEIS specifically noted that the lack of technical information made complete evaluation of the alternative impossible at that stage. In discussing methane mitigation measures, including flaring, that may be required in the future under MCC's lease stipulations, the SFEIS stated:

> Consideration of all these potential methane mitigation measures relies on site-specific exploration data yet to be authorized based on this analysis, data collected and resultant engineering designs for: 1) mining, 2) safety and finally 3) mitigation technology possibilities. These engineering designs would become part of the subsequent State or OSMRE mine permitting processes and MSHA ventilation plan process. Followed by other agencies issuing permits to mine. While opponents to this project would say we "can't kick the can down the road" because of global climate change concerns, the staged process under several

authorizing agencies, with defined roles and permitting stages, does not lend itself
well to prescribing specific mitigation measures for activities that have not been
proposed yet.

AR 000264. Similarly, as discussed above, USFS ROD stated that discussion of the alternative

was deliberately postponed until more information became available. AR 003390. This was not

a rigorous evaluation of the alternative, but rather, using the agencies' phrase, mere kicking the

can down the road.

Second, OSM's ROD. As discussed above, the ROD relies on the SFEIS for its

conclusions despite the fact that the SFEIS contains explicitly insufficient analysis. The

defendants argue that the ROD relies not just on the SFEIS but on R2P2 which contains

sufficient analysis of the alternative. As discussed above, OSM does not adopt or agree with the

conclusions regarding flaring reached in the R2P2, but rather references them only generally and

states that they provided no new information. The R2P2 may have thoroughly evaluated

methane flaring. But as OSM did not adopt or agree with its assessment, I cannot use the report

to rationalize the agency action that cannot be supported by facts in the record.

**B.  Cumulative Impacts of Climate Change**

Conservation groups argue that the agencies failed to adequately account for the

cumulative impacts of the proposed action when added to other past, present, and reasonably

foreseeable future actions. Defendants respond that they did account for the cumulative impacts

and that regardless, conservation groups waived the argument. Because conservation groups did

not raise this argument at the leasing stage, and the agency could have reasonably concluded that

new information did not significantly alter the analysis, the agency did not act arbitrarily.

NEPA's "action-forcing procedures" require agencies to "take a hard look at

environmental consequences" of their proposed actions. *Robertson v. Methow Valley Citizens*

*Council*, 490 U.S. 332, 350 (1989). These "environmental consequences" may be direct, indirect, or cumulative. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8. A "hard look" seeks to ensure the "agency did a careful job at fact gathering and otherwise supporting its position." *Richardson*, 565 F.3d at 704. The court must determine whether the agency "has adequately considered and disclosed the environmental impact of its actions" such that is decision is not arbitrary or capricious. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). Under 40 C.F.R. § 1508.7 (2018), cumulative impact is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."

Further, as discussed above, "[p]laintiffs must exhaust available administrative remedies before the USFS prior to bringing their grievances to federal court. . . . Claims not properly raised before an agency are waived, unless the problems underlying the claims are 'obvious' or otherwise brought to the agency's attention." *Forest Guardians*, 641 F.3d at 430 (internal quotations and citations omitted).

First, I find that conservation groups have waived their argument regarding the completeness of the cumulative impact analysis in the SFEIS, because they failed to raise it at the leasing stage. Conservation groups had the opportunity to comment at the leasing stage, and they did so. Defendants correctly point out that conservation groups' 129-page comment letter did not raise the cumulative impacts on climate change argument at the leasing stage. While the comment letter addresses both climate change and the other cumulative impacts of the action, it did not ask the agencies to alter their analysis of the action's cumulative impacts on climate change. ECF No. 29 at 22. Conservation groups do not claim that they raised this argument at

the leasing stage. ECF No. 26 at 28-32. As a result, conservation groups cannot challenge the sufficiency of the cumulative impacts analysis in the SFEIS.

However, conservation groups also challenge OSM's independent obligation to account for the cumulative impacts of climate change, given the new information available since the leasing stage. Preliminarily, this argument is not waived. As discussed above with regard to the methane flaring alternative, OSM did not provide an opportunity to comment on its approval of the mining plan. As such defendants cannot claim that conservation groups failed to exhaust administrative remedies by not raising this argument at that time.

OSM did not conduct its own cumulative impacts analysis, but instead relied on the SFEIS. AR 000028. Conservation groups claim that in doing so, OSM failed to account for OSM and other Interior Department coal-related activities that have been approved since the SFEIS was issues. NEPA requires "agencies take a 'hard look' at the environmental effects of their planned action, even after a proposal has received initial approval." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 368 (1989). Agencies "need not supplement an EIS every time new information comes to light." *Id*. at 373. They must do when there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed actions or its impacts." *Id*. at 372. Application of the "rule of reason" thus turns on the value of the new information to the still pending decisionmaking process." *Id*. at 374. "If there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." *Id*. Supporting documentation of a proposed action "must include an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed

may result in significantly different environmental effects."  43 C.F.R. § 46.120(c).

Conservation groups argue that new information, such as subsequent approved "federal coal

mining projects" constitute significant new information for which the agencies needed to

account.[3]

Conservation groups are correct that BLM, OSM, and USFS's post-leasing actions in

approving new coal mines will add to the cumulative impact on climate change from federal coal

activities.  They correctly note that a large portion of coal production in the United States occurs

on public lands and contributes approximately 10% of total U.S. greenhouse gas emissions.  ECF

No. 26 at 29-30.  However, conservation groups have not provided reason to think that the new

information will result in "significantly different environmental effects" than those already

considered in the SFEIS.  43 C.F.R. § 46.120(c).  "[A]n agency need not supplement an EIS

every time new information comes to light after the EIS is finalized.  To require otherwise would

render agency decisionmaking intractable, always awaiting updated information only to find the

new information outdated by the time a decision is made."  *Id*. at 373.  In *Marsh*, the Supreme

Court concluded that when the new information "requires a high level of technical expertise," the

court must defer to the "informed discretion of the responsible federal agencies," in deciding

whether the information is "significant."  *Id*. at 376-77.

I cannot find that the agency acted arbitrarily or capriciously in their decision not to

supplement the cumulative climate impacts analysis.  The agency could have reasonably

concluded that the new information here, the agencies' continued and uninterrupted authorization

---

[3] Conservation groups actually argue that the new information that must be considered includes "past, present, and reasonably foreseeable federal coal mining projects."  ECF No. 26 at 30.  Because the *Marsh* rule only allows for challenges of agencies' failure to examine *new* information, I will only consider the value of federal coal mining projects approved subsequent to the leasing stage.  Past project information is not new, and failure to account for it in the cumulative impacts analysis would have to be raised at the leasing stage in the groups' challenge to the SFEIS.

of coal activities, did not alter any analysis made at the leasing stage. Rather, this information could show the continuation of an ongoing pattern reflected in the SFEIS. Though I believe that the SFEIS did sufficiently weigh the threat that federal coal programs pose to the national and global climate, neither I nor conservation groups can substitute our judgment for the agencies'. Though the new information, like the old information, is troubling, conservation groups seem to be stuck with it.

Because conservation groups waived their cumulative impact argument against the SFEIS, and because the agency could have reasonably concluded that the new information did not "significantly" alter the analysis, the agency action is upheld. *Marsh*, 490 U.S. at 374.

### C. <u>Impacts on Water and Fish</u>

The agencies violated NEPA by failing to conduct further analysis given the new information regarding perennial streams that directly contradicted findings in the SFEIS. In its analysis of the proposed action's effects on groundwater resources, the SFEIS concluded that "there are no known perennial springs in the lease modification areas." AR 000364. Though the SFEIS does state in later section that "two short perennial stream reaches exists within the modification area," it clearly relied on the former conclusion in other parts of its analysis. AR 000755. For example, when describing likely impacts on local fish species, the SFEIS states several times that impacts are "not expected in analysis area due to lack of perennial water." AR 000750.

The locations of these conflicting statements are somewhat relevant. The statement that no perennial springs existed was made in the "Groundwater Resources" subsection of Section 3.8 "Watershed." AR 000361. Contrast the later statement which appears in Appendix B "Unsuitability Analysis and Report for Federal Coal Lease COC-1362, Modification 2 & Federal

Coal Lease COC-67232, Modification 1," in which USFS analyzes the applicability of exemptions to an OSM regulation governing the "unsuitability of federal lands for all or certain stipulated methods of coal mining." AR 000755, 43 C.F.R. § 3461.0–6. It seems fair to assume that parties concerned about the agencies' conclusions on watershed impacts of the proposed actions might look more closely at the former section and less closely at the later.

After reviewing new information provided according to MCC's lease stipulation, OSM completed a NEPA Adequacy Review form (NARF) and concluded that perennial springs did exist. AR 000043–44. Despite this, OSM concluded in the NARF that the environmental analysis in the SFEIS was adequate. AR 00038. Conservation groups argue that this shows that OSM's analysis of water impacts is arbitrary and capricious, because it relied on flawed analysis in the SFEIS. ECF No. 26 at 34. Respondents argue that the changes in water findings between the SFEIS and the NARF are not "new findings" requiring new analysis, but rather "minor clarifications and updates that do not diminish the continuing validity of the SFEIS for informing the mine plan modification." ECF No. 30 at 28, ECF No. 29 at 28.

As discussed above in the cumulative impacts section, agencies "need not supplement an EIS every time new information comes to light." *Marsh*, 490 U.S. at 373. Whether they must do so turns on the "value of the new information to the still pending decisionmaking process." *Id*. at 374. Supporting documentation of a proposed action "must include an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." 43 C.F.R. § 46.120(c).

The NARF unquestionably added new information. The SFEIS stated there were no known perennial springs in the expansion area. AR 000364. However, after reviewing the previously unexamined 2016 Annual Hydrology Report, OSM concluded in its NARF that

perennial streams likely did exist and would be affected by the expansion. AR 000038-44.

Among other changes, OSM revised SFEIS Section 3.8.1.6 regarding groundwater resources which previously read: "There are no known perennial springs for the lease modification areas." AR 000364. The sentence now reads: "Due to the fact that there are perennial reaches of South Prong Creek and Horse Creek within the lease modification area, it is likely that there are perennial springs associated with these reaches." AR 000043. OSM also revised part of Section 3.8.1.2 from "South Prong Creek and Horse Creek, as reported by MCC data, are ephemeral and flow only in response to spring runoff conditions and storm events," AR 000361, to "South Prong Creek and Horse Creek, as reported by MCC data, are perennial and intermittent." AR 000042. Finally, OSM also revised part of Section 3.8.3.2, which originally read only "[t]he lowering of the land surface may cause springs to migrate a few feet, but no discernable loss of water is anticipated," AR 000368, now adding that "[p]otentially some of the springs and seeps in the lease modification area could see a reduction or loss of flow due to the proposed longwall mining based on hydrographs in the 2016 report." AR 000044.

Defendants argue that all these changes are merely minor clarifications of the analysis in the SFEIS. Defendants argue, for example, that the change in classification of the South Prong Creek from ephemeral to perennial is not a truly new finding, because a map in the SFEIS correctly identified South Prong Creek as perennial and the SFEIS states correctly that the streams are perennial in Appendix B. ECF No. 29 at 30–31. This however, does not change the fact that *the text* of the SFEIS identifies South Prong Creek and other creeks incorrectly, and relies on those determinations for its conclusion that no perennial streams exist within the lease modification area. AR 000364.

Regarding the cumulative impacts question above, the agency could have reasonably concluded that the subsequent agency coal activities would not fundamentally alter the conclusions drawn in the SFEIS about the cumulative impacts on climate change. Here, in contrast, the new information serves to completely reverse the agency's previous conclusions that the action will not affect perennial streams. The agency could not reasonably conclude that the new information would not fundamentally alter the SFEIS conclusions. The finding that perennial streams exist is new information "sufficient to show that the remaining action will affect the quality of the human environment . . . to a significant extent not already considered" in the SFEIS. *Marsh*, 490 U.S. at 374. In light of the direct contradiction it presented, OSM's decision to ignore the new information and find the SFEIS adequate in the NARF was arbitrary and capricious.

**D.  Relief**

Though "[v]acatur is the normal remedy for an agency action that fails to comply with NEPA," *High Country II*, 67 F. Supp. 3d at 1263, "courts retain equitable discretion to fashion an appropriate remedy." *Diné Citizens Against Ruining Our Env't v. U.S. Office of Surface Mining Reclamation & Enf't, No*. 12-cv-01275-JLK, 2015 WL 1593995, at *1 (D. Colo. April 6, 2016). Conservation groups ask this Court to vacate the mining plan recommendation. They argue that this is the only "remedy that serves NEPA's fundamental purpose of requiring agencies to look before they leap," and the only one avoids a "pro-forma exercise in support of a 'predetermined outcome.'" ECF No. 26 at 40.

Defendants ask the court to issue a remand order to the agencies for further consideration of these issues. The two groups of defendants differ however, in their justification for seeking remand without vacatur or injunction. MCC argues that remand is appropriate because new

mining will not occur for several months, giving the agencies ample time to reconsider these issues before new mining begins. ECF No. 29 at 33. Simultaneously, federal defendants argue that remand is necessary to avoid job loss that would result if new mining were halted during the agency reconsideration. ECF No. 30 at 32. At the merits hearing, MCC changed its mind, also arguing that job loss might occur during the agency consideration period if new mining is not allowed to continue, effectively contradicting their previous argument that agencies would have enough time to consider before new mining began. It seems that all parties agree that agency reconsideration of these issues will likely continue through the proposed start of mining in the lease modification area.[4]

Conservation groups are correct that either vacatur or an injunction is necessary to avoid further NEPA violations. Only a remedy that prevents new mining in the expansion area will avoid subjecting conservation groups' valid objections to the "bureaucratic steamroller." *Davis v. Mineta*, 302 F.3d 1104, 1115 (10th Cir. 2002) (quoting *Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989) ("The difficulty of stopping a bureaucratic steam roller, once started . . . seems to us . . . a perfectly proper factor for a district court to take into account . . . on a motion for preliminary injunction.")), *abrogated on other grounds by Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016). Defendants' proposed timeline with new

---

[4] Defendants have one further argument: shortly before the hearing, MCC submitted a notice of supplemental information, ECF No. 39, detailing a new methane flaring system that the company believes they might be able to successfully implement. MCC has submitted a proposal for the new system to MSHA and is awaiting a ruling. ECF No. 39 at 3–4. At the hearing, MCC discussed the possibility of implementing this system and suggested that the company had no objection to methane flaring if it can be accomplished without compromising miner safety. In a subsequent motion, both defendants agreed to a voluntary remand without vacatur or injunction to allow agencies to consider the above issues as well as allow MSHA to rule on the new proposal. ECF No. 41. Conservation groups have not filed a response to this motion. Though all parties agree that the new flaring system appears nowhere in the administrative record and is therefore not technically relevant to the disposition of this case, MCC's actions indicate willingness to comply with NEPA and implement measures necessary to reduce its environmental impacts.

mining beginning in 2020 would allow mining to begin in the expansion area before adequate NEPA analysis was complete. New mining would unquestionably involve the release of methane, and potentially impact the perennial streams not considered within the agencies' decisions. Such a proposal would likely make any new NEPA analysis merely perfunctory and not actually informative of any agency decision. Because remand without vacatur or injunction would incentivize agencies to rubber stamp a new approval, rather than take a true and informed hard look, I must enjoin further action until the agency review is completed.

The mining plan ROD is remanded to the agency for further consideration of the methane flaring alternative and the impacts of the proposed action on water and fish resources. The other associated agency actions are vacated. Additionally, the intervenor defendants are immediately enjoined from proceeding with the mining plan, including further roadbuilding and well-drilling in the expansion area, until further analysis is conducted and MSHA has addressed the newly proposed methane flaring plan.

**ORDER**

Therefore the Court orders the following:

1. The federal defendants' March 12, 2019 Record of Decision is remanded for further consideration.

2. The federal defendants' March 15, 2019 NEPA Adequacy Review Form is vacated.

3. The federal defendants' March 15, 2019 Recommendation for Approval, Without Special Conditions of the proposed Mining Plan, is vacated.

4. The federal defendants' April 19, 2019 Mining Plan Approval is vacated.

5. The intervenor defendants are immediately enjoined from any and all action pursuant to those approvals.

DATED this 8th day of November, 2019.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge